UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

| | | |
|---|---|---|
| POWAN K. SINGH, | : | Case No. 14-2558 (TPG) |
| Plaintiffs, | : | |
| -- against -- | : | **FIRST AMENDED COMPLAINT** |
| NYCTL 2009-A TRUST; NYCTL 1998-2 TRUST; NYCTL 2011-A TRUST; NYCTL 2012-A TRUST; BANK OF NEW YORK MELLON; ROSICKI, ROSICKI & ASSOCIATES; TOWER CAPITAL MANAGEMENT, LLC.; PLYMOUTH PARK TAX SERVICES LLC D/B/A XSPAND; MTAG SERVICES, LLC; MOORING TAX ASSET GROUP, LLC | : : : : | Jury Trial Demanded |
| Defendants. | x | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Powan Singh, individually and on behalf of all others similarly situated, by and through his attorney, Paul Grobman, alleges as follows:

## NATURE OF THE CASE

1.   Plaintiffs bring this class action against Defendants under the Fair Debt Collection Practices Act, 15 U.S.C. §1692e, for violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et. seq. (hereinafter "RICO"), the New York General Business Law § 349; New York General Obligations Law §5-501 et. seq.; and for breach of contract, unjust enrichment and fraud on behalf of themselves and all other similarly situated persons who were injured by actions of the Defendants.

2.   As set forth below, Defendants have engaged in misconduct in connection with the servicing of residential tax liens assigned to defendants by the City of New York, including, but not limited to, routinely attempting to collect attorneys' fees, so-

called Debt Cancellation Fees, service of process fees and other legal expenses which had either never been incurred or for which they could not validly seek compensation, routinely misrepresenting that specific amounts for designated items were due and owing in Payoff Quotes when this was not the case, routinely demanding and collecting excessive amounts from taxpayers and then failing to pay interest on the amount overpaid, routinely charging interest in excess of that which they were allowed to charge by law or under the agreements they had with plaintiff taxpayers.

## JURISDICTION AND VENUE

3.   The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and the Class Action Fairness Act, 28 USC 1332(d), in that the matter in dispute is at least $5 million and plaintiffs are citizens of New York and maintain diverse citizenship from at least one of the Defendants.  This Court also has pendent and/or supplemental jurisdiction over Plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367.

4.   This Court has personal jurisdiction over the Defendants because they did or do business within the State of New York, and have minimum contacts with the State of New York based on purposeful availment of the laws of New York and continuous business activities in the jurisdiction.

5.   Venue is proper pursuant to 28 U.S.C. § 1391(a) in that the defendants do or have done business within this Judicial District and/or own property within this Judicial District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

6.   Plaintiff  Powan Singh currently resides at 1216 Liberty Avenue, Brooklyn, New York.   During the time period in question, plaintiff resided at 1062 Liberty Avenue, Brooklyn, New York 11208.

7.   Defendant NYCTL 2009-A Trust (hereinafter "the 2009-A Trust") is, upon information and belief, a Delaware business trust having an address at Rodney Square North, 1100 North Market Street, Wilmington, Delaware.

8.   Defendant NYCTL 1998-2 Trust (hereinafter "the 1998-2 Trust") is, upon information and belief, a Delaware business trust having an address at Rodney Square North, 1100 North Market Street, Wilmington, Delaware.

9.   Defendant NYCTL 2011-A Trust (hereinafter "the 2011-A Trust") is, upon information and belief, a Delaware business trust having an address at Rodney Square North, 1100 North Market Street, Wilmington, Delaware.

10. Defendant NYCTL 2012-A Trust (hereinafter "the 2012-A Trust") is, upon information and belief, a Delaware business trust having an address at Rodney Square North, 1100 North Market Street, Wilmington, Delaware.  (the 2009-A Trust, the 1998-2 Trust, the 2011-A Trust, and the 2012-A Trust are sometimes referred to collectively in this Complaint as "the Defendants Trusts")

11. Defendant The Bank of New York Mellon (hereinafter "BONY") is, upon information and belief, a New York Banking Corporation.   BONY is the Collateral Agent and Custodian for the 2009-A Trust, 2011-A Trust and the other NYCTL Trusts pursuant to an indenture agreement.

12. Defendant Rosicki, Rosicki & Associates is a law firm located in Plainview, New York.

13.   Defendant Tower Capital Management, LLC (hereinafter "Tower") is, upon information and belief, a Delaware limited liability corporation with its principal place of business in Morristown, New Jersey.  Tower is regularly engaged in the servicing of delinquent tax liens, including the tax liens at issue.

14.   Defendant Plymouth Park Tax Services LLC, doing business as XSPAND ("XSpand"), is a wholly owned subsidiary of JPMorgan Chase & Co.  In or about 2006, Plymouth Park purchased the assets of XSpand, Inc., which had previously been servicing liens for the NYCTL Trusts.

15.   Defendant MTAG Services LLC, (hereinafter "MTAG") is a Virginia limited liability company created to acquire the tax lien servicing business and related assets of Mooring Tax Asset Group, LLC, including liens associated with numerous NYCTL Trusts.

16. Defendant Mooring Tax Asset Group, LLC ("Mooring") owns MTAG and is the guarantor of MTAG's obligations under MTAG's servicing agreements with various NYCTL Tax Lien Trusts.  Mooring also previously serviced many liens assigned to various NYCTL Trusts.  (Tower, XSpand, MTAG and Mooring will sometimes be collectively referred to hereinafter as "the Servicers")

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

17. Plaintiff brings this as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following classes of persons who owned property in New York City subject to a lien for delinquent taxes, water and/or sewer charges, which was assigned to and/or serviced by defendants, and who suffered at least one of the following events:

(i)  who were told that they owed and/or were actually assessed attorneys' fees, expenses or disbursements by any of the defendants on behalf of an NYCTL Trust in cases where (i) there had been no judgment of foreclosure; (ii) no fees, expenses or disbursements were awarded by any Court; or (iii) the amounts collected were in excess of the amounts that the NYCTL attorneys were allowed to charge under their Retainer Agreements with the NYCTL Trusts; or

(ii)  who were overcharged by defendants and then denied interest on the refund of such overcharge; or

(iii) who may subject to the above conduct after the commencement of this action or in the future.

18.   Excluded from the Class are the Defendants, officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, as well as any entity in which Defendants have or had a controlling interest.

19.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be learned through appropriate discovery, documents provided by defendants indicate that there are thousands of members of the Class located in this State.

20. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal and state laws complained of herein.

21.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by members of the Class may be small, the expense and burden of individual litigation makes it virtually impossible for the Class members to seek redress on an individual basis for the wrongful conduct alleged.  Common questions of law and fact exist as to all members of the Class

and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are the following:

(a)  Whether defendants engaged in the fraudulent schemes or artifices
described herein;

(b)  Whether defendants formed association-in-fact enterprises (the "Fee-
and Expense- Shifting Enterprises") for the purpose of carrying out
Defendants' scheme;

(c)  Whether defendants formed an association with the alleged
enterprise to conduct or participate, directly or indirectly, in the affairs of
an enterprise through a pattern of racketeering activity in violation of 18
U.S.C. § 1962(c);

(d)  Whether defendants engaged in a pattern of racketeering activity with the
intent to defraud Plaintiffs and the Class using the U.S. mails and
interstate wire service in violation of 18 U.S.C. §§ 1341 and 1343 (mail
and wire fraud);

(e)  Whether defendants conspired to violate 18 U.S.C. § 1962(c) as
prohibited by 18 U.S.C. § 1962(d);

(f)  whether standardized Payoff Quote forms provided by defendants to
plaintiff and other members of the class routinely miscalculated the "Total
Due";

(g)   whether the defendants routinely charged a "Debt Cancellation Fee" or
"Fee to Discontinue Action" when no such fee exists, when defendants
had no right to collect such a fee, or when the purported services rendered
were grossly disproportionate to the amount charged;

(h)  whether the defendants routinely forced or attempted to force taxpayers to
pay Legal Fees and Costs which had not been incurred;

(i)   whether the defendants routinely forced or attempted to force taxpayers to
pay Legal Fees and Costs which were not authorized by the New York
City Administrative Code or the CPLR, the relevant underlying
agreements, or the defendants' Policies and Procedures;

(j)   whether defendants routinely demanded and collected amounts in excess
of the amounts actually due, by waiting months to refund such
overcharges, and by failing to pay interest for the period in which
overpayments were retained;

(k)  whether the Defendants routinely and systematically violated §349 of the General Business Law by means of the above practices;

(l)   whether Defendants were unjustly enriched by their actions;

(m)  whether Defendants routinely breached Forbearance and Payoff Plan Agreements entered into with the Class; and

(n)  whether the members of the Class have sustained damages as a result of the actions of Defendants complained of herein.

## BACKGROUND

### A.  PLAINTIFF'S PROPERTY AT 1062 LIBERTY AVENUE

22.    In or about 1987, plaintiff purchased the home at 1062 Liberty Avenue, Brooklyn, New York (hereinafter "the Liberty Avenue Property") for the use of his family, and lived there full-time from 1987 until around 2001.

23.   In or about late 2000s, plaintiff fell behind on certain sewer and water rents relating to the Property, which charges were owed to the City of New York.

24. Pursuant to statute, the aforesaid unpaid water and sewer charges became liens on the property.

25.   In June 2009, with these amounts still unpaid, the City sold the debts on these unpaid water and sewer liens totaling $27,067.67 to the defendant 2009-A Trust (hereinafter "the 2009-A Water and Sewer Lien").  BONY was the custodian of the Trust.

26.   The 2009-A Trust was one of the numerous New York City Tax Lien trusts which have purchased tens of thousands of tax, water and sewer liens from the City of New York (these Trusts are sometimes collectively referred to herein as "the NYCTL Trusts").

27.   At some time subsequent to the transfer of the 2009-A Water and Sewer Lien to the 2009-A Trust, defendant XSpand became the servicer of the 2009-A Water and Sewer Lien Sewer Lien pursuant to a Servicing Agreement between XSpand and the 2009-A Trust under which it agreed to service and collect on liens assigned to the 2009-A Trust by the City.   XSpand also had agreements with numerous other NYCTL Trusts to collect delinquent taxes and water and sewer charges owed by New York City residents, and regularly collected or attempted to collect amounts owed for water and sewer charges from City residents.

28.   XSpand had retainer agreements with numerous law firms on behalf of the various NYCTL Trusts and BONY under which the firms agreed to represent the Trusts and BONY in attempting to collect the delinquent amounts owed by New York City residents (these firms are hereinafter collectively referred to as "the NYCTL Law Firms").

29.   Among the firms with which the servicer had an agreement was Rosicki. As a result, Rosicki regularly collected or attempted to collect amounts owed for water and sewer charges from City residents.

**B.  PLAINTIFF'S PROPERTY AT 435 AUTUMN AVENUE**

30.    In or about 1989, plaintiff purchased property located at 435 Autumn Avenue, Brooklyn, New York (herein "the Autumn Avenue property").

31. In or about the late 2000s, plaintiff fell behind on the property tax payments relating to the Auburn Avenue Property, which charges were owed to the City of New York.

8

32. Pursuant to statute, the aforesaid unpaid property taxes became liens on the property.

33. In November 2011, with these amounts still unpaid, the City sold the debts on these unpaid tax liens to the defendant 2011-A Trust (hereinafter "the 2011-A Tax Lien").  BONY was the custodian of the 2011-A Trust.

34. In August 2012, the City sold the debts associated with a second tax lien on the property to the defendant 2012-A Trust (hereinafter "the 2012-A Tax Lien").  BONY was the custodian of the 2012-A Trust.

35. Thereafter, the 2011-A Tax Lien was assigned to the 1998-2 Trust.

36. At some time subsequent to the transfer of the liens to the 2011-A, 2012-A and 1998-2 Trusts, defendant MTAG became the servicer of the 2011-A Tax Lien and the 2012-A Tax Lien pursuant to a Servicing Agreement between MTAG and the 2011-A and 2012-A Trusts.   MTAG also had agreements with numerous other NYCTL Trusts and BONY to collect delinquent taxes and water and sewer charges owed by New York City residents, and regularly collected or attempted to collect amounts owed for water and sewer charges from City residents.

37. Mooring was the guarantor of MTAG's obligations under those Servicing Agreements.

38. Like XSpand, MTAG had retainer agreements with numerous law firms on behalf of the various NYCTL Trusts and BONY under which the firms agreed to represent the Trusts and BONY in attempting to collect the delinquent amounts owed by New York City residents.

39.  Among the law firms with which the servicer had an agreement was Windels, Marx and the law firm of Thomas Malone.   As a result, both Windels, Marx and the law firm of Thomas Malone regularly collected or attempted to collect amounts owed for water and sewer charges from City residents.

### C.   DEFENDANTS' ILLEGAL FEE- AND EXPENSE-SHIFTING SCHEMES

40.  Since the inception of the City's sale of liens to the NYCTL Trusts, the Trusts, BONY, the Servicers and the NYCTL Law Firms designed and executed schemes to defraud delinquent taxpayers with the objective of making them pay for purported legal fees and expenses which were not owed.

41.  The NYCTL Trusts, BONY, the Servicers and the NYCTL Law Firms designed and entered into multiple enterprises in which each entity had overlapping goals:

- The NYCTL Trusts and BONY sought to shift legal costs and expenses delinquent taxpayers to which they were not entitled, which they and their investors and beneficiaries (including New York City) would otherwise be responsible for;

- The Servicers sought a steady stream of servicing income on tax, water and sewer liens which went into foreclosure;

- The NYCTL Law Firms sought a steady stream of legal work from the Servicers and the NYCTL Trusts and BONY, which allowed them to recover legal fees and expenses from delinquent taxpayers, including substantial amounts which were inflated, illusory or to which they were otherwise not entitled by law or contract.

42.  To accomplish these objectives, the Trusts and BONY entered into Servicing Agreements with JER Revenue, XSpand, Tower, MTAG, Mooring and other servicers under which the Trusts and BONY were initially responsible for paying the "Lien

Administration Expenses" in relation to each individual lien, which the Servicing

Agreement described in relevant part as:

> fees and expenses related to the foreclosure process
> generally and to specific foreclosure proceedings such as
> recording, filing and other court-related fees; postage
> relating to servicing activities, the cost of credit reports, skip
> trace, bankruptcy, lien and title searches and asset location
> data base and research services…. the reasonable fees
> (including attorney incentive fees) and disbursements of all
> counsel and trustees retained in connection with such
> foreclosure proceedings, both individually and
> collectively….

43. To insure that the Trusts and/or BONY would not have to ultimately pay

these amounts, however, the Servicing Agreements obligated the Servicers  "to recover .

. . the largest amount possible with respect to each Tax Lien" from delinquent New York

City homeowners like plaintiff.

44.   The NYCTL Trusts, Servicers, Law Firms and BONY knew that, unlike

with a mortgage, no contract existed between the Trusts and city residents, and thus the

defendants could not rely on a contractual fee-shifting clause as a basis for passing fees

and expenses onto taxpayers.

45.   While Section 11-335 of the New York City Administrative Code gave

NYCTL Trusts and BONY the right to recover "attorney's fees" for "maintaining" a

foreclosure action, the right to recover such fees was not triggered until – at the earliest

– an lawsuit was actually commenced, and the statute further expressly required that the

attorney's fees be "reasonable."

46. Moreover, the statute was silent regarding the right to recover disbursements

and expenses.  Rather, §11-335 of the Administrative Code expressly incorporated the

provisions of the CPLR, which provides that disbursements may be awarded only (i)

after judgment, (ii) to the prevailing party, (iii) as specifically set forth in CPLR §8301; and (iv) upon application supported by bills and an affidavit showing that the fees have been "necessarily incurred and are reasonable in amount" (CPLR §8401)

47.  Thus, without a judgment of foreclosure and an application and award of disbursements by the Clerk and/or court, both New York City and New York State law demonstrate that no expenses can be demanded by the NYCTL Trusts or BONY.

48.  However, neither the NYCTL Trusts, the Servicers, the Law Firms or BONY were prepared to abide by these statutory restrictions, or by any contractual limitations on recovery put in place in the agreements between the Servicers, Trusts, BONY and/or Law Firms.

49.  Most citizens rightfully believe that charges arising from taxes and water and sewer charges owed the government are legitimate, and that entities seeking to collect those fees are not out to defraud them.  However, under the imprimatur of the City of New York, and with repeated threats of foreclosure unless all amounts demanded by the defendants were paid, the NYCTL Trusts, BONY, Servicers and Law Firms have fraudulently collected tens of millions of dollars in legal fees and expenses from thousands of New York City residents which were not owed through the following methods:

      (i)  falsely representing that certain legal fees and expenses had been "incurred" by the Trusts and BONY, when the services had not even been performed, much less billed to or paid by the Trusts or BONY;

      (ii)  falsely representing that legal disbursements and expenses were "due" and "owing" before judgment or an award of such amounts;

      (iii)   falsely representing that legal disbursements and expenses were "due" and owing when they were not among those allowed to be recovered under the CPLR;

(iv)  falsely representing that legal fees and expenses were "due" and owing, when the NYCTL Law Firms had no right to charge these amounts under their Retainer Agreements with the Trusts, Servicers or BONY;

(v)   fraudulently concealing the terms of the Retainer Agreements from state court clerks and judges entertaining motions for legal fees under CPLR §8401, in order to  allow the NYCTL Trusts, Law Firms and BONY to collect greater expenses from city taxpayers than could be collected from the Trusts or BONY themselves;

(vi) fraudulently concealing the terms of the Retainer Agreements from state court clerks and judges entertaining motions for legal fees, in order to  allow the NYCTL Trusts, BONY and Law Firms to collect legal fees from city taxpayers in amounts greater than could be collected from the Trusts or BONY themselves;

(vii)  repeatedly submitting affidavits in state foreclosure proceedings which represented that the disbursements sought have been "necessarily incurred and are reasonable in amount", knowing that the expenses cannot be "reasonable in amount" because they are in excess of what the Trusts, BONY and Servicers themselves agreed to pay.

50.  Thus, many of the expenses set forth as "Lien Administration Expenses" in the Servicing Agreements are not recoverable under either  §11-335 of the New York City Administrative Code or Article 83 of the Civil Practice Law & Rules. Nevertheless, defendants and the other NYCTL Trusts, Servicers and Law Firms routinely sought such Lien Administrative Expenses from New York City homeowners like plaintiff who owed taxes and/or water and sewer charges, despite the lack of any statutory right to do so.

51.   Moreover, while the Retainer Agreements between the NYCTL Trusts, BONY and the Servicers, on the one hand, and the NYCTL Law Firms, on the other, nominally required the law firms to charge only certain legal fees and expenses in certain specified amounts, when delinquent New York City homeowners paid the fees,

the Servicers made no attempt to limit the amounts which the NYCTL Law Firms and other service providers actually billed to the amounts they were permitted to bill in the Retainer Agreements.

52.  In fact, in another case involving the NYCTL Trusts, XSpand admitted that it had no written Policies and Procedures in place with regard to the assessment and collection of legal fees and expenses in foreclosure for any of the NYCTL Trusts it serviced.  See Plymouth Park Tax Servicing, LLC's Response to Non-Party Subpoena Served in Boyd v. J.E. Robert Co., 05-cv-2455 (E.D.N.Y. 2005) Annexed to the initial Complaint as Exhibit A; Excerpts from the deposition of  Hillary Leonard appearing on behalf of Plymouth Park annexed to the initial Complaint as Exh. B, at pp. 74, 75, 92, 118, 132)

53.  Since the NYCTL Trusts or BONY themselves did not have any written Policies or Procedures, there were no written Policies and Procedures in place with regard to the assessment and collection of legal fees and expenses in foreclosure for any of the NYCTL liens serviced by XSpand.  (Annexed to the initial Complaint as Exh. B, pp. 69-70)

54.  Moreover, despite the fact that the Retainer Agreements with the NYCTL Law Firms contained limitations on the legal fees and expenses which the law firms could charge in foreclosures brought by the NYCTL Trusts and BONY, XSpand ignored those limitations when shifting legal fees and expenses from the NYCTL Trusts and BONY to delinquent New York City homeowners like plaintiff.   Thus, as a matter of practice and policy, XSpand regularly passed on all legal fees, disbursements and expenses purportedly incurred in connection with foreclosures brought by the 2009-A

and other NYCTL Trusts and BONY, apart from expenses for secretarial overtime, property inspections and Broker Price Opinions.  (See Exh. B to initial Complaint, at pp. 84, 86-90, 97)

55. Thus, when delinquent New York City homeowners sued by BONY, the 2009-A, the 1998-2 and the other NYCTL Trusts in foreclosure requested a Payoff Quote of the amount owed to pay off the lien, defendants regularly misrepresented the amount of legal fees and expenses which the Trusts, BONY and the servicers (i) were allowed to be charged under the Retainer Agreements with the NYCTL Law Firms; and (ii) which they actually paid to the NYCTL Law Firms.  As a result of this deception, the NYCTL Law Firms received substantially more in legal fees and expenses than they were entitled to under their Retainer Agreements with the NYCTL Trusts and BONY.

56.  When there was a judgment of foreclosure, the 2009-A, the 1998-2, the other NYCTL Trusts and BONY regularly made the same misrepresentations described in the preceding paragraph to the Court when moving for disbursements under Article 83 and 84 of the CPLR.   Since the Trusts, BONY and the NYCTL Law Firms could not show that legal fees and expenses were "necessarily incurred" and "reasonable in amount" as required by §8401 of the CPLR if the fees and expenses were in excess of those allowed under the Retainer Agreements, the Trusts, BONY, the Servicers and the NYCTL Law Firms concealed and misrepresented the terms of the Retainer Agreements from the Courts entertaining motions for disbursements.  As a result of this deception, the NYCTL Law Firms received substantially more in legal fees and expenses than they were entitled to under the CPLR.

57.  Even after the judgment of foreclosure and award of attorneys fees and expenses by the Court, XSpand Inc. admitted that it routinely ignored the amounts of attorneys, disbursements and expenses awarded by the Court in actions brought by NYCTL Trusts and BONY on the liens it serviced, fraudulently representing that other additional amounts not awarded were due and owing.  (Exh. B to initial Complaint, pp. 133-136)    As a result of this deception, the NYCTL Law Firms received substantially more in legal fees and expenses than they were entitled to under the judgments awarded by the courts.

58. Moreover, when delinquent New York City homeowners sued by BONY, the defendant Trusts and the other NYCTL Trusts in foreclosure requested a Payoff Quote before a foreclosure judgment had been rendered, defendants regularly misrepresented – (and continue to misrepresent) that costs, expenses and disbursement were then due and owing, even though disbursements are not owed under the Administrative Code §11-335 or the CPLR until a judgment has been rendered and disbursements awarded under Article 83 and 84 of the CPLR.   As a result of this deception, the Trusts, BONY and NYCTL Law Firms received substantially more in disbursements and expenses from delinquent New York City property owners than they were entitled to under city or state law.

59.  When delinquent New York City residents sued by BONY, the defendant Trusts and the other NYCTL Trusts in foreclosure requested a Payoff Quote before a foreclosure judgment had been rendered, defendants also regularly misrepresented (and continue to misrepresent) that certain expenses and disbursement were due and owing, even though such disbursements were not among those which could be passed on by the

prevailing party under the Administrative Code §11-335 or the CPLR after judgment. As a result of this deception, the Trusts , BONY and NYCTL Law Firms recovered disbursements and expenses from New York City homeowners which otherwise would have been borne by them.

60. Finally, when delinquent New York City homeowners requested a Payoff Quote from the defendants and the other NYCTL Trusts, Servicers and Law Firms, as a matter of practice and policy, BONY, the NYCTL Trusts, Servicers and Law Firms regularly (i) included estimates of future legal fees and expenses as presently due and owing in the Payoff Quote; and (ii) included legal fees and expenses for services which had not even been performed (much less paid for), requiring those estimated fees and expenses to be fully paid before the foreclosure would be halted.  As a result, New York City residents whose delinquent liens were put into foreclosure are routinely forced to pay thousands of dollars more than the amounts which were actually owed.  Months later, defendants sometimes send homeowners a "refund" which purportedly matches the amount of the overpayment, without interest.

### D.  DEFENDANTS' ILLEGAL ACTIONS AGAINST PLAINTIFF SINGH

#### 1.  PLAINTIFF'S PROPERTY AT 1062 LIBERTY AVENUE

61.   On or about March 31, 2011, the 2009-A Trust and BONY commenced an action against the plaintiff to foreclose on the property based on the outstanding amount owed under the 2009-A Water and Sewer Lien.  The Rosicki firm represented the 2009-A Trust and BONY in the action.

62.  Like most homeowners facing a foreclosure action by the NYCTL Trusts and BONY, plaintiff represented himself pro se in the foreclosure action.

17

### i.  The March 28, 2012 Letter

63.  By letter dated March 28, 2012, XSpand, the 2009-A Trust and BONY represented to plaintiff that -- in addition to principal and interest -- attorneys fees disbursements and expenses were now due and owing to defendants as a result of the commencement of the foreclosure.  XSpand, the 2009-A Trust and BONY knew that this representation was false, because under §11-335 of the New York City Administrative Code, disbursements and expenses are not owed until a foreclosure judgment has been granted to the defendants and disbursements and expenses are moved for and awarded by the Court.   Defendants had not been granted any foreclosure judgment in the action against plaintiff, much less awarded disbursements and expenses.

64.  Moreover, under §11-335, attorneys fees are also not presently due and owing until they are set and awarded by the Court.

### ii.  The March 28, 2012 Payoff Quote

65.  By a Payoff Quote dated March 28, 2012, XSpand, the 2009-A Trust and BONY represented that plaintiff owed a total of $54,948.36 on the Lien, including $10,447.11 in previous payments, and $44,501.25 which was still due. XSpand, the 2009-A Trust and BONY knew that this representation of the total amount for which plaintiff was responsible was false, because the $54,948.36 consisted in part of disbursements and expenses which were not owed until (a) a foreclosure judgment has been granted to the defendants and (b) costs, disbursements and expenses were awarded by the Court.

### iii.  The March 28, 2012 Payment Plan Summary

66.     By a Payment Plan Summary dated March 28, 2012, XSpand, the 2009-A Trust and BONY represented that plaintiff owed a total of $54,949.33 on the Lien, including $10,447.11 in previous payments, and $44,502.22 which was still due. XSpand, the 2009-A Trust and BONY knew that this representation of the total amount for which plaintiff was responsible was false, because the $54,949.33 consisted in part of costs, disbursements and expenses which were not owed until (a) a foreclosure judgment has been granted to the defendants and (b) costs, disbursements and expenses were awarded by the Court.

67. In reliance on XSpand, the 2009-A Trust and BONY's representations, in or about late March 2012, plaintiff provided defendants with a check for $10,447.11 which included amounts to pay the purported attorneys fees, costs, disbursements and expenses which were allegedly owed to the defendants.

68.   Thereafter, XSpand, the 2009-A Trust and BONY entered into a payment plan with plaintiff regarding the remaining amounts which were allegedly owed which, unbeknownst to plaintiff, included attorneys fees and expenses which had not been incurred by the 2009-A Trust, BONY or XSpand and for which they had no statutory right to recover.

### iv. **The August 15, 2012 Letter**

69.   By letter dated August 15 2012, defendant XSpand, the 2009-A Trust and BONY advised plaintiff that he was delinquent on four monthly payments and owed $16,330.92.  XSpand, the 2009-A Trust and BONY knew that the amount purportedly owed was inaccurate, because it consisted in part of disbursements and expenses which had not been incurred and which were not owed or recoverable until a foreclosure

judgment has been granted to the defendants and disbursements and expenses are moved for and awarded by the Court.

70.   By letter dated January 29, 2013, defendant XSpand advised plaintiff that he was delinquent on the payment plan and that payment in full of all amounts owed was now required.

### v.  The January 29, 2013 Payoff Quote

71.   XSpand, the 2009-A Trust and BONY provided a Payoff Quote dated January 29, 2013 which purportedly showed the amount that plaintiff owed Defendants. The Payoff Quote prepared by XSpand represented that the 2009-A Trust and BONY had incurred (and plaintiff was responsible for) a total of $10,569.00 in fees broken down as follows:  $6,989.00 in "Legal Fees/Costs"; $540.00 for "Foreclosure Search"; $2,785.00 for "Service Process"; and $255.00 in "Court Filing Fees."   Of the total of $10,569.00 in attorneys fees and expenses which plaintiff purportedly owed, the Payoff Quoted represented that plaintiff had paid $9,459.00, and that another $1,110.00 in fees and costs was still "due."

72.   XSpand, the 2009-A Trust and BONY knew that the attorneys fees and costs charged to plaintiff as set forth in the January 29, 2013 Payoff Quote were inaccurate, because it consisted of costs, disbursements and expenses which had never been incurred by the 2009-A Trust or BONY and which were in any event not owed or recoverable against the plaintiff until (a) a foreclosure judgment has been granted to the defendants and (b) disbursements and expenses are moved for and awarded by the Court.

73.   Moreover, even if there had been a judgment against plaintiff, XSpand, the 2009-A Trust and BONY knew that many of the expenses and disbursements in the

January 29, 2013 Payoff Quote are not among those which the CPLR (expressly incorporated by Administrative Code §11-335) permits the prevailing party to recover. "Service Process" (for which defendants said plaintiff owed $2,785.00) is not among the specific recoverable expenses under §8301 of the CPLR, nor is "Court Filing Fees" (for which defendants said plaintiff owed $255.00).

74.  By letter dated March 15, 2013, defendant Tower identified itself as the new servicer of the 2009-A Water and Sewer Lien Sewer Lien and stated that the amounts due were now owed to the NYCTL 1998-2 Trust.

### vi.  The April 3, 2013 Payoff Quote

75. By a Payoff Quote provided to plaintiff dated April 3, 2013, Tower, the 1998-2 Trust and BONY represented the amount that plaintiff purportedly owed on the lien.  The Payoff Quote prepared by Tower represented that the Trusts and BONY had incurred (and plaintiff was responsible for) a total of $9,869.00 in fees broken down as follows:  $860.00 for a "Court Entry Fee", $255.00 for a "Filing Fee", $5,429.00 for a "Legal Fee", $540.00 for "Title Search" and $2,785.00 in "Service of Process Fees."

76.  Tower, the 1998-2 Trust and BONY knew that the attorneys fees and costs charged to plaintiff as set forth in the April 3, 2013 Payoff Quote were inaccurate, because they consisted of disbursements and expenses which had never been incurred by the Trusts or BONY and which were in any event not owed or recoverable against the plaintiff until (a) a foreclosure judgment has been granted to the defendants and (b) disbursements and expenses are moved for and awarded by the Court.

77.  Moreover, even if there had been a judgment against plaintiff, Tower, the 1998-2 Trust and BONY knew that many of the expenses and disbursements in the April

3, 2013 Payoff Quote are not among those which the CPLR (expressly incorporated in Administrative Code §11-335) permits the prevailing party to recover.  "Service of Process" (for which defendants said plaintiff owed $2,785.00) is not among the specific recoverable expenses under §8301 of the CPLR, nor is "Court Entry Fees (for which defendants said plaintiff owed $860.00) or Court Filing Fees (for which defendants said plaintiff owed $255.00).   In fact, to the best of plaintiff's knowledge, the "Court Entry Fee" described in the April 3, 2013 Payoff Quote does not exist.

78.  In addition, upon information and belief, the $5,429.00 in purported "Legal Fees" was grossly disproportionate to the amount that Tower, the 1998-2 Trust and BONY were allowed to demand from plaintiff, as it was far in excess of the amount defendant Rosicki was entitled to collect under its Retainer Agreement with XSpand, Tower, and the 2009-A and 1998-2 Trusts.

79.   The April 3, 2013 Payoff Quote also represented that it did not include any Legal Fees or Costs which were "estimated."  Tower, the 1998-2 Trust and BONY knew that this was false.

### vii. Plaintiff's First Payment Based On Defendants' False Representations

80.     On or about May 1, 2013, plaintiff paid over $23,000 to Tower, BONY and the 1998-2 Trust on the 2009-A Water and Sewer Lien Sewer Lien, based on the false representations regarding the amounts owed in the various Payoff Quotes and other documents provided by the defendants.

### viii. Plaintiff's Second Payment Based On Defendants' False Representations

81.   On or about May 22, 2013, plaintiff paid an additional $13,500 to Tower, the 2009-A Trust, the 1998-2 Trust and BONY on the 2009-A Water and Sewer Lien Sewer Lien based on written representations regarding the amounts owed in the Payoff Quotes provided by the defendants as well as other communications.

### ix. **Plaintiff's Third Payment Based On Defendants' False Representations**

82.   On or about October 11, 2013, plaintiff paid an additional $5,000 to Tower, the 2009-A Trust, the 1998-2 Trust and BONY on the 2009-A Water and Sewer Lien Sewer Lien based on the representations regarding the amounts owed in the Payoff Quotes provided by the defendants as well as other communications.

### x. **The October 18, 2013 Letter And Refund**

83.  By letter dated October 18, 2013, Tower, BONY and the 1998-2 Trust advised the plaintiff that he had paid sufficient funds to redeem the 2009-A Water and Sewer Lien Sewer Lien, and enclosed a check in the amount of $13,725.00 which defendants said represented the amount that plaintiff paid in excess of the total amount actually owed.  However, Tower, the 1998-2 Trust and BONY's calculations were knowingly false, because they knew that many of the costs, disbursements and expenses charged to plaintiff (i) had never been incurred by the 2009-A Trust, the 1998-2 Trust or BONY; (ii) were prohibited under the Retainer Agreement between the Rosicki firm and XSpand, Tower, and the 2009-A and 1998-2 Trusts;  (iii) were not owed or recoverable against the plaintiff until a foreclosure judgment had been granted to the defendants and costs, disbursements and expenses were awarded by the Court.

84. All told, plaintiff paid $58,963.03 to pay off the 2009-A Water and Sewer Lien Sewer Lien, including an estimated $13,000 in legal fees, costs, disbursements and expenses which were illusory, inflated, illegal and/or otherwise improper.

85.

## 2.  PLAINTIFF'S PROPERTY AT 435 AUBURN AVENUE

### i. The April 18, 2012 Letter

86.  By letter dated April 18, 2012, XSpand and the 2011-A Trust advised plaintiff that he was in default on the lien and that, unless the amounts were immediately paid, XSpand and the Trust would refer commence a foreclosure, at which time plaintiff would owe attorneys fees and expenses:

> The referral of this matter to our attorneys for foreclosure will result in additional fees and costs being assessed and added to the total amount due.  That referral is scheduled to occur on or about May 15, 2012.

Both XSpand and the 2011-A Trust knew that the representations regarding the "additional fees and costs" becoming due upon referral were false.  Under 11-335 of the Administrative Code, legal fees cannot be "assessed" or added to  the "total amount due" until – at the earliest – the actual commencement of the action.

87.  Moreover, both XSpand and the 2011-A Trust knew that -- under 11-335 of the Administrative Code and Article 83 and 84 of the CPLR --  "costs" cannot be "assessed" or added to  the "total amount due" until after a judgment of foreclosure and the award of such costs by the court entertaining the foreclosure.

### ii. Commencement of the Foreclosure Action

88.  On or about July 3, 2012, the 2011-A Trust and BONY commenced an action against the plaintiff to foreclose on the property located at 435 Auburn Avenue

based on the outstanding amount owed under the 2011-A Tax Lien.  Windels Marx firm represented the 2011-A Trust and BONY in the action.

89.  Plaintiff represents himself pro se in the foreclosure action.

90. Pursuant to a Servicing Agreement dated August 11, 2011, MTAG was the servicer of the lien for the Auburn Avenue property on behalf of the 2011-A NYCTL Trust, managing and administering the collection and foreclosure of tax liens held by the 2011-A and other NYCTL Trusts.

### iii. The February 18, 2014 Letter Regarding The 2011-A Lien

91.  On February 18, 2014, MTAG and the NYCTL 2011-A Trust emailed a form letter to plaintiff accompanying a Payoff Quote.  The form letter represented that plaintiff might owe legal fees and expenses to the 2012-A Trust in addition to those set forth on the accompanying Payoff Quote even if he paid immediately:

> IF THIS ACCOUNT HAS BEEN REFERRED TO AN ATTORNEY FOR FORECLOSURE, THIS PAYOFF QUOTE MAY INCLUDE ESTIMATED LEGAL FEES AND COSTS.  ADDITIONAL CHARGES MAY BE ADDED AS A RESULT OF FORECLOSURE-RELATED FEES OR COSTS.  ALL ADDITIONAL CHARGES MUST BE PAID IN ORDER FOR THE LIEN TO BE SASTISFIED.

92.  MTAG and the NYCTL 2011-A Trust knew that these statements in the form letter were false in numerous respects.  First, under Admin. Code 11-335, no legal fees or expenses are owed when a lien is "**REFERRED** TO AN ATTORNEY FOR FORECLOSURE."  Rather, attorneys' fees are only recoverable (at the earliest) after commencement of a lawsuit by the Trust.  Expenses are only recoverable if the Court enters a judgment of foreclosure and awards disbursements and expenses.

93.   Second, by saying that "ADDITIONAL CHARGES MAY BE ADDED", the Payoff Letter fraudulently conceals the fact that the NYCTL Trusts, BONY and Servicers routinely demand *more* legal fees and expenses than are actually owed by New York residents, regularly demanding legal fees and expenses for services that have not even been *performed*, much less *billed*.

94. Finally, in stating that "ALL ADDITIONAL CHARGES MUST BE PAID IN ORDER FOR THE LIEN TO BE SATISFIED", the letter fraudulently creates the impression that the Trusts are allowed to unilaterally determine the amount of legal fees and expenses owed as they see fit, without any right to challenge the assessment of such fees and expenses.

95. MTAG and the Trusts regularly provide this misleading form letter to New York City residents whose liens have been assigned to the Trusts.

**iv. The February 18, 2014 Payoff Quote On The 2011-A Lien**

96. On February 18, 2014, MTAG and the 2011-A Trust emailed a Payoff Quote to plaintiff through an attorney.  The February 18, 2014 Payoff Quote said that $14,279.01 was now due, including $7,000.00 in fees, broken down as follows: $3,400.00 in "Legal Fees", and $3,600.00 in "Legal Expenses."

97.   MTAG, the 2011-A Trust and BONY knew that the "Legal Expenses" charged to plaintiff as set forth in the February 18, 2014 Payoff Quote were inaccurate, because they consisted of disbursements and expenses which had never been incurred by the Trust or BONY and which were in any event not owed or recoverable against the plaintiff until (a) a foreclosure judgment has been granted to the defendants and (b) disbursements and expenses were awarded by the Court.

98.   Moreover, even if there had been a judgment against plaintiff, upon information and belief, many of the expenses and disbursements in the February 18th Payoff Quote are not among those which the CPLR (expressly incorporated in Administrative Code §11-335) permits the prevailing party to recover.

99.   In addition, upon information and belief, MTAG and the 2011-A Trust knew that the $3,400.00 in purported "Legal Fees" were more than the amount that MTAG, the 2011-A Trust and BONY were allowed to demand from plaintiff, as it was in excess of the amount defendant Windels Marx was entitled to collect under its Retainer Agreement at this juncture in the proceedings.

**v. The February 18, 2014 Payoff Quote On The 2012-A Lien**

100.    On February 18, 2014, MTAG and the 2012-A Trust emailed a Payoff Quote to plaintiff through an attorney.  The February 18, 2014 Payoff Quote represented that $5,942.86 was now due on the lien, including $1,532.66 in fees, broken down as follows:  $1,000.00 in "Legal Fees", and $532.66 in "Legal Expenses."

101.   MTAG, the 2012-A Trust knew that the "Legal Fees" purportedly owed by plaintiff as set forth in the February 18, 2014 Payoff Quote were fraudulent. Both MTAG and the 2012-A Trust knew that no legal fees were owed by plaintiff to the 2012-A Trust because, under §11-335 of the Administrative Code, legal fees cannot be charged until – at the earliest – the commencement of an action by the 2012-A Trust.

102.    MTAG and the 2012-A Trust knew that the "Legal Expenses" purportedly owed by plaintiff as set forth in the February 18, 2014 Payoff Quote were fraudulent. Both MTAG and the 2012-A Trust knew that no legal expenses were owed to the 2012-A Trust by plaintiff because -- under §11-335 of the Administrative Code

and Article 83 and 84 of the CPLR – disbursements and expenses are not owed until

after a judgment of foreclosure and the award of such expenses by the court.

### vi. The February 18, 2014 Letter Regarding The 2012-A Lien

103.    The MTAG and the NYCTL 2012-A Trust emailed an identical form

letter to plaintiff concerning the 2012-A lien as the one received from the 2011-A Trust.

The letter is false for the same reasons described in Paragraphs 90-94 above.

### CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF RICO, 18 U.S.C. § 1962(C):  AGAINST DEFENDANTS FOR CONDUCTING THE AFFAIRS OF ILLEGAL FEE ENTERPRISE THROUGH A PATTER OF RACKETEERING ACTIVITY

104.    Plaintiff repeats and realleges each and every allegation set forth in all of

the preceding paragraphs as if fully set forth herein.

105.    As detailed above, defendants and the other NYCTL Trusts, Servicers

and NYCTL Law Firms designed and executed schemes to defraud New York City

residents by making them pay for purported legal fees and expenses which were neither

incurred nor owed.

106.    Plaintiff and thousands of other New York City residents relied on

defendants' fraudulent representations by paying these legal fees and expenses in order

to avoid foreclosure.

107.    Defendants violated  18 U.S.C. §1962(c) by the acts described in the prior

paragraphs, and as further described below.


### A.  THE ENTERPRISES

**1.  The Illegal Fee- And Expense-Sharing Enterprise Involving the 2009-A Trust, the 1998-2 Trust, BONY, XSpand, Tower, Rosicki And Other NYCTL Law Firms**

108.   Defendant the 2009-A Trust, the 1998-2 Trust, XSpand, BONY, Tower, Rosicki and other NYCTL Law Firms form an association-in-fact for the common and continuing purposes described herein, including in Paragraphs 40-84 above, and constitute an enterprise within the meaning of 18 U.S.C. §1961(4) ("the 2009-A and 1998-2 Fee- And Expense- Shifting Enterprise").

109.   The members of the 2009-A and 1998-2 Fee- And Expense- Shifting Enterprise have functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  The 2009-A and 1998-2 Fee- And Expense- Shifting Enterprise has been engaged in, and continues to engage in, activities which have substantially affected interstate commerce.

110.   Various agreements bind the members of the 2009-A and 1998-2 Fee-And Expense- Shifting Enterprise together including, but not limited to (i) the agreement between BONY and the 2009-A Trust and 1998-2 Trust;  (ii) the Servicing Agreements between 2009-A Trust and XSpand, Tower and other NYCTL Servicers, (iii) the Retainer Agreements between the 2009-A Trust, XSpand, Tower and other NYCTL Servicers, on the one hand, and Rosicki and other NYCTL Law Firms, on the other.

**2.  The Illegal Fee- And Expense-Sharing Enterprise Involving the 2011-A Trust, BONY, XSpand, MTAG, Windels Marx And Other NYCTL Law Firms**

111.   Defendant the 2011-A Trust, BONY, XSpand, MTAG, Windels Marx and other NYCTL Law Firms form an association-in-fact for the common and continuing

purposes described herein, including Paragraphs 85-102 above, and constitute an enterprise within the meaning of 18 U.S.C. §1961(4) ("the 2011-A Fee- And Expense- Shifting Enterprise").

112.   The members of the 2011-A Fee- And Expense- Shifting Enterprise have functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  The 2011-A Fee- And Expense- Shifting Enterprise has been engaged in, and continues to engage in, activities which have substantially affected interstate commerce.

113.    Various agreements bind the members of the 2011-A Fee- And Expense- Shifting Enterprise together including, but not limited to (i) the agreement between BONY and the 2011-A Trust ; (ii) the Servicing Agreements between 2011-A Trust and XSpand, MTAG and other NYCTL Servicers, (iii) the Retainer Agreements between the 2011-A Trust, XSpand, MTAG and other NYCTL Servicers, on the one hand, and Windels Marx and other NYCTL Law Firms, on the other.

### 3.  The Illegal Fee- And Expense-Sharing Enterprise Involving the 2012-A Trust, MTAG And Certain NYCTL Law Firms

114.   Defendant the 2012-A Trust, MTAG, Windels Marx and other NYCTL Law Firms form an association-in-fact for the common and continuing purposes described herein, including Paragraphs 85-102 above, and constitute an enterprise within the meaning of 18 U.S.C. §1961(4) ("the 2011-A Fee- and Expense- Shifting Enterprise").

115.   The members of the 2012-A Fee- And Expense- Shifting Enterprise have functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  The 2012-A Fee- and

Expense- Shifting Enterprise has been engaged in, and continues to engage in, activities which have substantially affected interstate commerce.

116.    Various agreements bind the members of the 2012-A Fee- And Expense-Shifting Enterprise together including, but not limited to (i) the agreement between BONY and the 2012-A Trust;  (ii) the Servicing Agreements between BONY, the 2012-A Trust and MTAG and other NYCTL Servicers, (iii) the Retainer Agreements between the 2012-A Trust, MTAG and other NYCTL Servicers, on the one hand, and the NYCTL Law Firms representing them, on the other.

## B. THE PATTERN OF RACKETEERING ACTIVITY

117.    Defendants were associated with and/or employed by the various Fee-And Expense- Shifting Enterprises and knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the affairs of the those Enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The racketeering activity was made possible by defendants regular and repeated use of the facilities and services of the various Fee- And Expense- Shifting Enterprises.  Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

118.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(l)(B).  Defendants committed at least two such acts or else aided and abetted such acts.

119.    The acts of racketeering were not isolated, but rather the acts of defendants and the other members of the various Fee- And Expense- Shifting Enterprises were related in that they had the same or similar purpose and result,

participants, victims and methods of commission.  Further, the acts of racketeering by the various Fee- And Expense- Shifting Enterprises were numerous and continue to the present.  There has been repeated a n d  s u b s t a n t i a l  i l l e g a l  conduct extending over many years, and which poses a substantial threat of continuing indefinitely into the future.

### MAIL FRAUD

120.   Defendant committed acts constituting indictable offenses under 18 U.S.C.§ 1341, in that they devised or intended to devise a scheme or artifice to defraud Singh and other Class members, or to obtain money or property from Singh and other Class members by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendant caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom. The acts of Defendant set forth above were done with knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendant's scheme or artifice.

121.   D e f e n d a n t s  carried out the scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers.

**1.  The Illegal Fee- And Expense-Sharing Scheme Involving the 2009-A Trust, the 1998-2 Trust, BONY, XSpand, Tower, Rosicki And Other NYCTL Law Firms**

122.   One part of the 2009-A and 1998-2 Fee- And Expense- Shifting Scheme involved the 2009-A Trust, the 1998-2 Trust, BONY, XSpand and Tower sending numerous letters and payoff quotes to delinquent New York City residents which falsely and fraudulently (i) identified disbursements and expenses as owed before a foreclosure judgment and award of such disbursements and expenses by the state court, and (ii) identified certain attorneys fees as due and owing before legal services had even been performed much less billed; and (iii) overstated the amount of legal fees and expenses owed by projecting legal fees and expenses into the future; and (iv) identified certain expenses and disbursements as owed even though they were not among those which are recoverable under the New York City Administrative Code or Article 83 and 84 of the CPLR; and (v) represented that attorneys fees were due and owing which were in excess of the amounts the NYCTL Law Firms were allowed to charge under their Retainer Agreements with the NYCTL Trusts, XSpand, Tower and other Servicers.

123.   Another part of the 2009-A and 1998-2 Fee- And Expense- Shifting Scheme involved the 2009-A Trust, the 1998-2 Trust, BONY, XSpand, Tower, Rosicki and the other NYCTL Law Firms representing to state foreclosure Courts that certain fees and expenses were reasonable and necessarily incurred even though such fees and expenses were in excess of the amounts that the NYCTL

Law Firms were allowed to charge under their Retainer Agreements with the NYCTL Trusts and BONY.

124.   In connection with the sending or receipt of such materials, the 2009-A Trust, the 1998-2 Trust, BONY, XSpand, Tower, Rosicki and other NYCTL Law Firms caused to be delivered interstate communications that contained false or fraudulent statements, or things not themselves false or fraudulent but which were essential parts of Defendants' scheme.

125.   In furtherance of the 2009-A and 1998-2 Fee- And Expense- Shifting Scheme Fee-Splitting Scheme, the 2009-A Trust, the 1998-2 Trust, BONY XSpand, Tower, Rosicki and other NYCTL Law Firms executed Master Service Agreements, Retainer Agreements and other documents relating to the Fee and Expense- Shifting Scheme which were sent through the U.S. mails and/or commercial interstate carriers and over U.S. wires.

### 2. The Illegal Fee- And Expense-Sharing Scheme Involving the 2011-A Trust, BONY, XSpand, MTAG, Windels Marx And Other NYCTL Law Firms

126.   One part of the 2011-A Fee- And Expense- Shifting Scheme involved the 2011-A Trust, BONY, XSpand, MTAG and other NYCTL Servicers sending letters and payoff quotes to delinquent New York City residents which falsely and fraudulently (i) identified disbursements and expenses as due and owing before a foreclosure judgment and award of such disbursements and expenses by the state court, and (ii) identified certain attorneys fees as due and owing before legal services had even been performed much less billed; and (iii) overstated the amount of legal fees and expenses owed by projecting legal fees and expenses into the future; and (iv) identified certain expenses and

disbursements as owed even though they were not among those which are recoverable under the New York City Administrative Code or Article 83 and 84 of the CPLR; and (v) represented that attorneys fees were due and owing which were in excess of the amounts the NYCTL Law Firms were allowed to charge under their Retainer Agreements with the NYCTL Trusts, XSpand, MTAG and other NYCTL Servicers.

127.   Another part of the 2011-A Fee- And Expense- Shifting Scheme involves the 2011-A Trust, BONY, XSpand, MTAG, Windels Marx and the other NYCTL Law Firms representing to state courts in foreclosure that certain fees and expenses were reasonable and necessarily incurred even though such fees and expenses were in excess of the amounts that Windels Marx and the NYCTL Law Firms were allowed to charge under their Retainer Agreements with the NYCTL Trusts and BONY.

128.   In connection with the sending or receipt of such materials, the 2011-A Trust, BONY, XSpand, MTAG, Windels Marx and other NYCTL Law Firms caused to be delivered interstate communications that contained false or fraudulent statements, or things not themselves false or fraudulent but which were essential parts of Defendants' scheme.

129.   In furtherance of the 2011-A Fee- And Expense- Shifting Scheme Fee- Splitting Scheme, the 2011-A Trust, BONY, XSpand, MTAG, Windels Marx and other NYCTL Law Firms executed Master Service Agreements, Retainer Agreements and other documents relating to the Fee and Expense- Shifting Scheme which were sent through the U.S. mails and/or commercial interstate carriers and over U.S. wires.

### 3.  The Illegal Fee- And Expense-Sharing Scheme Involving the 2012-A Trust, XSpand, MTAG And Certain NYCTL Law Firms

130.   One part of the 2012-A Fee- And Expense- Shifting Scheme involved the 2012-A Trust, MTAG and other NYCTL Servicers sending letters and payoff quotes to delinquent New York City residents which falsely and fraudulently (i) identified disbursements and expenses as due and owing before a foreclosure judgment and award of such disbursements and expenses by the state court, and (ii) identified certain attorneys fees as due and owing before legal services had even been performed much less billed; and (iii) overstated the amount of legal fees and expenses owed by projecting legal fees and expenses into the future; and (iv) identified certain expenses and disbursements as owed even though they were not among those which are recoverable under the New York City Administrative Code or Article 83 and 84 of the CPLR; and (v) represented that attorneys fees were due and owing which were in excess of the amounts the NYCTL Law Firms were allowed to charge under their Retainer Agreements with the NYCTL Trusts, MTAG and other NYCTL Servicers.

131.   Another part of the 2012-A Fee- And Expense- Shifting Scheme involves the 2012-A Trust, MTAG, and certain NYCTL Law Firms representing to state courts in foreclosure actions that certain fees and expenses were reasonable and necessarily incurred even though such fees and expenses were in excess of the amounts that the NYCTL Law Firms were allowed to charge under their Retainer Agreements with the NYCTL Trusts.

132.   In connection with the sending or receipt of such materials, the 2012-A Trust,  MTAG, and certain NYCTL Law Firms representing them caused to be delivered interstate communications that contained false or fraudulent statements, or things not themselves false or fraudulent but which were essential parts of Defendants' scheme.

133.   In furtherance of the 2012-A Fee- And Expense- Shifting Scheme Fee-Splitting Scheme, the 2012-A Trust, MTAG and certain NYCTL Law Firms executed Master Service Agreements, Retainer Agreements and other documents relating to the Fee and Expense- Shifting Scheme which were sent through the U.S. mails and/or commercial interstate carriers and over U.S. wires.

**WIRE FRAUD**

134.   Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1343, in that they devised or intended to devise a scheme or artifice to defraud Singh and other Class members, or to obtain money or property from Singh and other Class members by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing the scheme or artifice, Defendants transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals.  These acts were done intentionally and knowingly with the specific intent to advance Defendant's scheme or artifice, or with knowledge that the use of the wires communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

135.   Defendant carried out its scheme in different states and could not have done so unless they used the interstate wires.  The defendant NYCTL Trusts, NYCTL Servicers, NYCTL Law Firms and BONY used the interstate wires on a daily basis when transmitting invoicing and account activity information containing the false representations described above over databases and through e-mails and facsimiles. Likewise, the defendant NYCTL Trusts, NYCTL Servicers, NYCTL Law Firms and BONY regularly used the wires to send falsely inflated invoices or other demands for payment to delinquent New York City residents, including Singh and other Class members.  The defendant NYCTL Trusts, NYCTL Servicers, NYCTL Law Firms and BONY used (and continue to use) the wires thousands of times to transmit false and fraudulent statements, or communications themselves not false or fraudulent but which were essential to carrying out each of the defendants' schemes.

**INJURY**

136.   Singh and the Class have been proximately injured in their business or reason of Defendants' violation of 18 U.S.C. § 1962(c) by having to pay the illegal amounts sought by the defendants, and by incurring legal and other expenses associated with the illegal activity.

**COUNT II**

**VIOLATION OF RICO, 18 U.S.C. § 1962(D):**
**AGAINST ALL DEFENDANTS**

137.   Plaintiff repeats and re-avers each and every statement contained in the Paragraphs above.

138.   In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate §1962(c).  The conspiracy commenced at least as early as 2000 and continued at least until 2010.

139.   The object of the conspiracy was to falsely and fraudulently represent that legal fees and expenses were owed by delinquent New York City taxpaying residents in order to obtain money or property rightfully belonging to Singh and other Class members.

140.   Defendants knowingly, willfully and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the various Fee- and Expense-Shifting Enterprises through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§ 1341 and 1343, in violation of 18 U.S.C. § 1962(c).   Defendants each objectively manifested their agreement to the commission of the substantive RICO violations by at least one member of the conspiracy by words or acts.

141.  Defendants each committed at least one overt act of racketeering or other wrongful activity in furtherance of such conspiracy.

142.  Even if Defendant did not agree to specifically harm Singh or other Class members, the purpose of the acts that caused them injury was to advance the overall object of the conspiracy, and the harm to Singh or other Class members was a reasonably foreseeable consequence of Defendants' various Fee- and Expense-Shifting Schemes.

## COUNT III

### DECEPTIVE AND MISLEADING PRACTICES
### (NY GBL §§ 349) AGAINST ALL DEFENDANTS

143.   Plaintiffs repeat and reallege all previous Paragraphs of the Complaint as if fully set forth herein.

144.   Defendants' actions constitute deceptive acts and practices that violate General Business Law § 349, because the acts and practices are materially deceptive and misleading and deceived plaintiffs and have a broad impact on consumers at large, including the other members of the Class.

145.   The members of the class were injured by Defendants materially misleading and/or deceptive acts and practices because they were required to pay fees, charges and/or attorneys' fees which were in excess of those permitted by the underlying loan documents or applicable statutes.

146.   Defendants' violations of General Business Law § 349 were knowing and willful or, at a minimum, reckless, and amount to fraud.  As a result, Plaintiffs are entitled to recover threefold the actual damages they incurred.

147.   As a result of Defendants' violations of General Business Law §349, Plaintiffs and every other member of the Class are entitled to injunctive relief, actual damages, punitive damages, costs and reasonable attorneys' fees.

## COUNT IV

### UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

148.   Plaintiffs repeat and reallege all previous paragraphs of the Complaint as if fully set forth herein.

149.   Defendants charged and received compensation for attorneys' fees, expenses, disbursements and other fees and costs of collection allegedly incurred in connection with defendants' collecting upon the Liens.

150.   Such attorneys' fees, expenses, disbursements and other fees and costs of collection had not been incurred by defendants, were excessive or were not owed.

151.   Defendants had no right under contract or statute to charge for attorneys' fees, expenses, disbursement and other alleged costs of collection that had not been incurred by defendants, were excessive, or were otherwise unauthorized.

152.   It would be inequitable for defendants to retain these amounts which the Defendants had no right to charge or collect, and Defendants have been unjustly enriched by doing so.

153.   As a result of the foregoing, Plaintiff and the class seek restitution in the amounts charged for such attorneys' fees, disbursements and other alleged fees and costs of collection, which they had no right to collect, plus interest and costs incurred.

## <u>COUNT V</u>

### FRAUD AGAINST ALL DEFENDANTS EXCEPT
### FOR BANK OF NEW YORK

154.   Plaintiffs repeats and realleges all previous paragraphs of the Complaint as if fully set forth herein.

155.   Defendants falsely represented to plaintiffs and members of the class that certain amounts of legal fees and expenses were due and owing.

156.   Plaintiffs reasonably relied on those representations and thereby suffered damages.

## COUNT VI

### PIERCING THE CORPORATE VEIL; AGAINST MOORING TAX ASSET GROUP

157.   Plaintiff repeats and realleges all previous paragraphs of the Complaint as if fully set forth herein.

158.   MTAG was organized in 2010 as the successor of, and to acquire the tax lien servicing business and related assets of defendant Mooring Tax Asset Group (hereinafter "Mooring"), and for all intents and purposes Mooring is the alter ego of MTAG.

159.   Mooring was the Guarantor of MTAG's actions under the Servicing Agreements with the NYCTL Trusts and BONY, and was contractually obligated ensure that the Trusts and BONY did not engage in any illegal conduct in connection with the attempt to collect the amounts purportedly owed by delinquent New York City residents.

160.   Upon information and belief, Mooring is also the owner of MTAG, and the two companies are believed to share common officers, owners, Boards of Directors, offices, employees and assets.

161.   Upon information and belief, Mooring kept MTAG undercapitalized in order to avoid incurring liability.

162.   As a result, Mooring should be held responsible for any wrongdoing found to have been conducted by MTAG.

**WHEREFORE**, Plaintiffs respectfully pray for relief and judgment as follows:

(i)   Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing their counsel as class counsel;

42

    (ii)        Awarding compensatory and statutory damages in favor of
Plaintiffs and the other Class Members against the Defendants for
all damages sustained as a result of the Defendants' wrongdoing,
in an amount to be established at trial, including interest thereon;

    (iii)      Enjoining defendants from engaging in future actions which
violate state law or the form agreements between defendants and
delinquent New York City taxpayers;

    (iv)      Awarding Plaintiffs and the Class their reasonable costs and
expenses incurred in this action, including counsel fees; and

    (v)       Awarding such other and further relief as the Court deems
appropriate.

Dated: New York, New York
         February 9, 2015

                             THE LAW OFFICES OF PAUL GROBMAN

                                //SS//
                            Paul Grobman  (PG 1876)
                            555 Fifth Avenue, 17th Floor
                            New York, NY 10017
                            Tel:  (212) 983-5880
                            Fax: (212) 682-7060

                            *Counsel for Plaintiffs*