UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

POWAN K. SINGH,

                     Plaintiff,               14 Civ. 2558

      -against-                      OPINION

NYCTL 2009-A TRUST; NYCTL 1998-2 TRUST;
NYCTL 2011-A TRUST; NYCTL 2012-A TRUST;
BANK OF NEW YORK MELLON; ROSICKI, ROSICKI
& ASSOCIATES; TOWER CAPITAL MANAGEMENT,
LLC; PLYMOUTH PARK TAX SERVICES LLC D/B/A
XSPAND; MTAG SERVICES, LLC; MOORING TAX
ASSET GROUP, LLC,

                     Defendants.

------------------------------------------X

A P P E A R A N C E S:

            <u>Attorneys for Plaintiff</u>

            PAUL GROBMAN, ESQ.
            555 Fifth Avenue, 17th Floor
            New York, NY 10017

            <u>Attorneys for Defendants</u>
            NYCTL 2009-A Trust, NYCTL 1998-2 Trust,
            NYCTL 2011-A Trust, NYCTL 2012-A Trust,
            The Bank of New York Mellon, Tower Capital
            Management, LLC, Plymouth Park Tax Services
            LLC, MTAG Services, LLC, and Mooring Tax
            Asset Group, LLC

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/20/16

COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington, DC 20001
By:   Robert D. Wick, Esq.
      Christian J. Pistilli, Esq.
      Henry B. Liu, Esq.


Attorney for Defendants
NYCTL 2009-A Trust, NYCTL 1998-2 Trust,
NYCTL 2011-A Trust, and NYCTL 2012-A Trust

CORPORATION COUNSEL OF THE CITY OF NEW YORK
Assistant Corporation Counsel
100 Church Street, Room 2-126
New York, NY 10007
By:   Zachary W. Carter, Esq.

**Sweet, D.J.**

Defendants NYCTL 2009-A Trust (the "2009-A Trust"), NYCTL 1998-2 Trust (the "1998-2 Trust"), NYCTL 2011-A Trust (the "2011-A Trust"), NYCTL 2012-A Trust (the "2012-A Trust" and, collectively, the "Trusts"); The Bank of New York Mellon, as custodian of the Trusts ("BNYM"); Tower Capital Management, LLC ("Tower"), Plymouth Park Tax Services LLC d/b/a Xspand ("Xspand"), and MTAG Services, LLC ("MTAG" and, collectively, the "Servicers"); and Mooring Tax Asset Group, LLC ("Mooring") (Collectively, the "City Defendants") and Rosicki, Rosicki & Associates P.C. (the "Rosicki Firm" or the "Defendant Firm"), have moved pursuant to Rule 12(b)6, F. R. Civ. P. to dismiss the Amended Complaint (the "Complaint") of Powan K. Singh ("Singh" or the "Plaintiff"). Based on the conclusions set forth below, the motion is granted, and the Complaint dismissed.

The Plaintiff has challenged the procedures under which the Defendants seek attorneys' fees and costs when efforts are made to foreclose on tax liens after a taxpayer fails to pay New York City water, sewer and tax charges. His claims are barred by New York law and in certain instances inadequately pled.

1

**Prior Proceedings**

The Plaintiff filed his complaint on April 10, 2014, and the action was assigned to the Honorable Thomas P. Griesa. The Plaintiff filed his Amended Complaint on February 11, 2015.

On March 9, 2015, the Rosicki Firm filed its Rule 12(b)6 motion to dismiss and on March 10, the remaining defendants filed their Rule 12(b)6 motion.  On June 26, 2016, the action was reassigned to the Honorable Robert W. Sweet.  The motions were heard and marked fully submitted on March 17, 2016.

**The Complaint**

The allegations in the Amended Complaint ("Complaint") fall into three categories:

(1)  allegations regarding Plaintiff's property at 1062 Liberty Avenue; (2) allegations relating to Plaintiff's property at 435 Autumn Avenue; and (3) general allegations of wrongdoing.  Each of these categories is addressed below.

A. The Liberty Avenue Property

        The Plaintiff owned residential property located at
1062 Liberty Avenue in Brooklyn. (Compl. at ¶ 22.)  After
Plaintiff failed to pay more than $27,000 in water and sewer
charges to the City of New York, the charges were converted to
tax liens on the property pursuant to New York law. (Id. at ¶¶
23-25.) In June 2009, the City sold those tax liens to the
2009-A Trust. (Id. at ¶ 25.) According to the Complaint,
Xspand was for a time the "servicer" of the Liberty Avenue tax
liens "pursuant to a Servicing Agreement between Xspand and the
2009-A Trust." (Id. at ¶ 27.) Xspand, in turn, retained the
Rosicki firm to commence a foreclosure action against the
Liberty Avenue property. (See id. at ¶ 61.) The foreclosure
action began in March 2011. (Id.)


        On March 28, 2012, Xspand sent Plaintiff a letter
offering to settle the Liberty Avenue foreclosure action. (See
Compl. at ¶¶ 63-64; Pistilli Decl. Ex. 1.) Under the proposed
settlement agreement, Plaintiff "acknowledge[d] and agree[d]
that the amount due under the [Liberty Avenue] Tax Lien as of
March 28, 2012 [wa]s $54,949.33," inclusive of attorneys' fees
and costs. (Pistilli. Decl. Ex. 2, at Recital 2, ¶¶ 1, 5.) The
proposed agreement required Plaintiff to make an immediate
payment of $10,447.11, and to pay the remaining balance on the
lien in twelve monthly installments. (Id. at ¶¶ 2-3.) In

                                    3

exchange, Xspand would agree "to forebear from exercising rights and remedies available to [it] on behalf of the [2009-A] Trust, including foreclosure proceedings against the Property." (Id. at ¶ 12.)

The Plaintiff elected to execute the settlement agreement with Xspand and, "in or about late March 2012," wrote an initial check for $10,447.11 to the 2009-A Trust. (See Compl. at ¶¶ 67-68; Pistilli. Decl. Ex. 2.) By letters dated August 15, 2012 and January 29, 2013, Xspand informed Plaintiff that he had failed to make the required monthly installment payments, and thus was delinquent under the terms of the settlement agreement. (Compl. ¶¶ 69-70; Pistilli. Decl. Exs. 3, 4.) The January 2013 letter also informed Plaintiff that, effective February 2013, Tower would be the "new Servicer" of the Liberty Avenue tax liens. (Pistilli. Decl. Ex. 4; see also Compl. at ¶ 74 (acknowledging that Tower became the "new servicer" in early 2013).)

Thereafter, Tower continued to attempt to collect the amounts that Plaintiff owed. (See id. at ¶ 75.) In May 2013, the remaining balance due on the Liberty Avenue tax lien was satisfied. (See id. ¶¶ 80-81.) Tower subsequently refunded to Plaintiff overpayments made in connection with the Liberty

4

Avenue tax lien.  (Pistilli. Decl. Ex. 5; see also Compl. at ¶

83.3.)


B. The Autumn Avenue Property


Plaintiff also owned property located at 435 Autumn

Avenue in Brooklyn.  (Compl. at ¶ 30.)  After Plaintiff failed

to pay property taxes to the City, the delinquent taxes were

converted to liens on the property.  (Id. at ¶¶ 31-32.)  In and

after November 2011, the City sold or assigned the unpaid tax

liens to the Trusts.  (Id. at ¶¶ 33-35.)  According to the

Complaint, MTAG was the "servicer" of the Autumn Avenue tax

liens "pursuant to a Servicing Agreement between MTAG" and the

Trusts.  (Id. at ¶ 36.)


Defendants made several attempts to communicate with

Plaintiff about the tax lien on the Autumn Avenue property.  On

April 18, 2012, Xspand sent Plaintiff a letter informing him

that he had failed to pay property taxes owed to the City.  (Id.

at ¶ 85; see Pistilli Decl. Ex. 6.)  The letter further stated

that "[t]he referral of this matter to our attorneys for

foreclosure will result in additional fees and costs being

assessed and added to the total amount due."  Id.  Similarly, on

February 18, 2014, MTAG informed Plaintiff that he had failed to

pay the balance on the outstanding tax liens for the Autumn
Avenue property.  (Compl. at ¶¶ 91, 96; see Pistilli Decl. Exs.
7-8.)  The letters also told Plaintiff that he owed $20,203.87
in delinquent taxes, interest, and "estimated legal fees and
costs."  (Id.)

         Plaintiff did not respond to those communications; nor
did he make any payments on the Autumn Avenue property.  As a
result, on January 14, 2015, BNYM and the 2011-A Trust obtained
a foreclosure judgment on the Autumn Avenue property.
(Pistilli. Decl. Ex. 9.)  The final judgment awarded legal fees
and costs to the attorneys representing Defendants in the
foreclosure action.  (Id. at 5-6.)

         C. Additional Claims Unrelated to Plaintiff or Defendants

         The Complaint alleges that Defendants "regularly made
. . . misrepresentations . . . to the Court when moving for"
awards of attorneys' fees and costs at the conclusion of
foreclosure actions.  (Compl. at ¶ 56; see also id. at ¶¶ 57,
122.)

         The Complaint asserts that the Servicers and various
law firms (including Rosicki, Rosicki & Associates, P.C.)

breached agreements among the Trusts, the Servicers and the law firms by seeking legal fees in excess of what the law firms were permitted to charge under those agreements. (Id. at ¶¶ 49(v)-(vi), 51, 54.) Plaintiff was not a party to those contracts. The Complaint also alleges violation of RICO, state statutes and unjust enrichment.

### *The Standard of Review*

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). However, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to

7

relief." <u>Twombly</u>, 550 U.S. at 557 (internal quotation marks omitted).

While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" <u>Munoz-Nagel v. Guess, Inc.</u>, No. 12-1312, 2013 WL 1809772, *3 (S.D.N.Y. Apr. 30, 2013) (quoting <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010)); <u>Prince v. Madison Square Garden</u>, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); <u>Williams v. Calderoni</u>, No. 11-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." <u>Twombly</u>, 550 U.S. at 555 (citation and internal quotation omitted).

***Attorneys' Fees and Costs are Collectible in Foreclosure Actions under New York Law that Have Been Settled or Brought to Judgment***

Plaintiff alleges with respect to several of his claims that New York law forbids the collection of attorneys' fees and costs incurred in attempting to collect on tax liens unless and "until a foreclosure judgment has been granted" and

fees and expenses are "awarded by the Court." (E.g., Compl. at
¶¶ 63-64.)


Here, Plaintiff alleges he owned two properties that
were delinquent on water and sewer payments. Plaintiff does not
dispute falling behind on certain water and sewer payments to
the City. (Compl. at ¶¶ 23, 31.) Instead, Plaintiff contests
the total amount of legal fees and costs associated with
bringing foreclosure actions in connection with the two
properties that Plaintiff owned.


New York law provides that "[a] plaintiff in an action
to foreclose a tax lien shall recover reasonable attorney's fees
for maintaining such action." N.Y.C. Admin. Code § 11-335
(hereinafter, "Section 11-335"). Section 11-335 does not
require that a judgment of foreclosure be entered to recover
attorneys' fees incurred in a foreclosure action; rather, it
authorizes recovery of attorneys' fees for the mere maintenance
of a foreclosure action. See Boyd v. J.E. Robert Co., No. 05
Civ. 2455 (KAM)(RER), 2012 WL 4718823, at *9 (E.D.N.Y. Aug. 27,
2012) ("Plaintiff's argument that § 11-335 imposes entry of
judgment as a precondition to recovery of attorney's fees is
without merit."). Plaintiff's interpretation of Section 11-335,
is contrary to the plain language of the statute.

9

Plaintiff also argues that the New York civil practice law and rules ("CPLR") provide that "disbursements may be awarded only . . . after judgment" and an "award of disbursements" by a court. (Compl. at ¶¶ 46-47 (citing CPLR § 8401).) While the CPLR authorizes an award of disbursements after final judgment, it does not preclude recovery of litigation costs as part of a settlement prior to final judgment. See Boyd, 2012 WL 4718823, at *11 (citing Oliphant v. Simboski, No. 303 CV 2038(SRU), 2005 WL 756505, at *4 (D. Conn. Mar. 31, 2005)).

Plaintiff's interpretation is also rejected because construing Section 11-335 to preclude the recovery of litigation expenses as part of the pre-judgment, voluntary resolution of a foreclosure action would conflict with the strong public policy favoring settlement. See Childs v. Levitt, 151 A.D.2d 318, 319 (N.Y. App. Div. 1989) ("it is the strong policy of our courts to encourage the settlement of disputes"). There is no dispute that lienholders are entitled to attorneys' fees and costs at the conclusion of a successful foreclosure action. As Magistrate Judge Reyes recognized in Boyd, a rule prohibiting such lienholders from obtaining in settlement what they undisputedly could obtain after a final judgment "would

10

practically eliminate voluntary settlements" of foreclosure
actions.  Boyd, 2012 WL 4718823, at *10 ("even if Plaintiffs
were correct in arguing that entry of judgment is a prerequisite
to recovery of attorney's fees, nothing in the statute precludes
parties from contracting around that requirement in the context
of settlement"); Childs, 151 A.D.2d at 320 ("[I]t has long been
recognized that a stipulation need not be consistent with
applicable statutes. . . . [Parties] 'may stipulate away
statutory, and even constitutional rights.'" (quoting Matter of
New York, Lackawanna & W.R.R. Co., 98 N.Y. 447, 453 (1885)).

### The *Noerr-Pennington* Doctrine Bars Plaintiff's Claims

Plaintiff brings his claims against Defendants for
allegedly illegal conduct in settlement negotiations for the
foreclosure actions, which violates the Noerr-Pennington
doctrine.  The Noerr-Pennington doctrine grants immunity from
liability to parties who petition the government for redress.
See, e.g., Cal. Motor Transp. Co. v. Trucking Unlimited, 404
U.S. 508, 510-11 (1972).  Although the doctrine arose in the
antitrust context, the Second Circuit has extended Noerr-
Pennington to encompass all petitioning activity, including good
faith litigation and "concerted efforts incident to litigation,
such as pre-litigation 'threat letters,' and settlement offers."

11

Primetime 24 Joint Venture v. Nat. Broad., Co., Inc., 219 F.3d
92, 100 (2d Cir. 2000).  As the Court explained, litigation-
related communications "are not literally petitions to the
government," but they are "a preliminary step to resort to
litigation if necessary" and "therefore fall[] within the
protection of the Noerr-Pennington doctrine."  Id.

     Each of Plaintiff's claims is predicated on
Defendants' alleged misrepresentations in demand letters,
default letters, and settlement communications – all of which
are related to good faith foreclosure litigation involving
Plaintiff's properties.  (See, e.g., Compl. at ¶¶ 63-103.)
Courts in this Circuit have held that these types of litigation
communications are immune from liability under the First
Amendment protected by Noerr-Pennington.  See Barbarian Rugby
Wear, Inc. v. PRL USA Holdings, Inc., No. 06 CV 2652(JGK), 2009
WL 884515, at *6 (S.D.N.Y. Mar. 31, 2009) (Noerr-Pennington
applies to "sending pre-litigation demand letters and filing
lawsuits"); DirecTV, Inc. v. Lewis, No. 03 CV 6241(JWF), 2005 WL
1006030, at *5 (W.D.N.Y. Apr. 29, 2005) (litigation-related
communications with an opposing party "are protected by the
Noerr-Pennington doctrine"); Matsushita Elec. Corp. v. Loral
Corp., 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (settlement

communications "are entitled to immunity to the same extent as
the related litigation").

Courts have applied Noerr-Pennington to bar liability
under all of Plaintiff's claims in this action.  The Ninth
Cicuit applied Noerr-Pennington to RICO claims in Sosa, a RICO
claim for sending allegedly fraudulent demand letters and
settlement communications, just as Plaintiffs allege in this
case.  Sosa v. DirectTV, 437 F.3d 923, 926-27 (9th Cir. 2006).
The court held that RICO and the mail and wire fraud statutes do
not "unambiguously reach demands to settle reasonably based
legal claims."  Id. at 940.  The court thus concluded that
litigation communications "demanding settlement of legal claims
must be afforded Noerr-Pennington protection."  Id. at 942.
Adopting the reasoning from Sosa, here the settlement demands
for legal claims regarding foreclosure cannot form the basis for
RICO claims under the Noerr-Pennington doctrine.

The Second Circuit has similarly applied Noerr-
Pennington to RICO, GBL § 349, and common law fraud claims.
See, e.g., Bath Petroleum Storage, Inc. v. Market Hub Partners,
L.P., 229 F.3d 1135 (2d Cir. 2000) (summary order) ("Noerr
Pennington immunity is applicable to RICO actions and to state-
law claims such as fraud. . . .");  DirecTV, Inc. v. Rowland, No.

13

04 CV 2975, 2005 WL 189722, at *4 (W.D.N.Y. Jan. 22, 2005)
(applying Noerr-Pennington to GBL § 349 claims).

The limited exception to Noerr-Pennington for "sham"
activities is inapplicable to this case. The sham exception
applies only where the litigation is "objectively baseless in
the sense that no reasonable litigant could realistically expect
success on the merits" whereas here, Defendants reasonably did
expect success on the merits. Prof'l Real Estate Investors,
Inc. v. Columbia Pictures Indus., 508 U.S. 49, 60 (1993). The
foreclosure litigation against Plaintiff in this case was not
objectively baseless because Plaintiff admits that he failed to
pay the water, sewer and tax charges on his properties. (Compl.
at ¶¶ 23, 25, 31, 33.) Nor could the Defendants' interpretation
of New York law to authorize the recovery of attorneys' fees and
costs prior to the entry of a final foreclosure judgment be
characterized as "objectively baseless." To the contrary, at
least one federal court has agreed with that interpretation that
recovery of attorneys' fees prior to final judgment does not
fall within the sham exception. See Boyd, 2012 WL 4718823, at
*9-10. Neither party has offered contrary authority.
Accordingly, Plaintiff's claims are dismissed under Noerr-
Pennington.

14

***Plaintiff's Claims Fail under the FDCPA because the Liens Are not Debt under the Statute***

The Plaintiff claims that the Noerr-Pennington doctrine does not provide immunity from actions brought under the Fair Debt Collection Practices Act ("FDCPA") for intentional misrepresentations made during litigation.  However, a recent Second Circuit decision involving the FDCPA confirms that the collection of mandatory water and sewer charges do not involve consumer-oriented conduct, which is required under the statute. See Boyd v. J.E. Robert Co., 765 F.3d 123, 126 (2d Cir. 2014). Under the FDCPA, a "debt" is defined in part as the "obligation of a consumer to pay money."  15 U.S.C. § 1692a(5).  In Boyd, the court concluded that "[l]iens for mandatory water and sewer charges imposed by New York City as an incident to property ownership are not 'debt' under the FDCPA because the relationship between [property owners]."  Id. at 126. Therefore, Plaintiff's FDCPA claim fails for the reasons stated in the Second Circuit's opinion in Boyd.

Here, Plaintiff attempts to distinguish Boyd by bringing the claims under RICO in addition to the FDCPA.  In a line of cases beginning with California Motor Transportation Co. v. Trucking Unlimited, 404 U.S. 508 (1972), the Supreme Court has held that courts should "construe federal statutes so as to

15

avoid burdening conduct that implicates the protections afforded
by the Petition Clause unless the statute clearly provides
otherwise." Sosa, 437 F.3d at 931. The FDCPA "clearly provides
otherwise," it is "intended to burden debt-collectors even when
they are engaged in litigation." Hartman, 569 F.3d at 615-16
(citing Heintz v. Jenkins, 514 U.S. 219 (1995)). By contrast,
there is no indication that Congress intended to burden
litigation conduct under RICO. See Sosa, 437 F.3d at 942.
Accordingly, RICO is construed "to avoid burdening the ability
of potentially adverse parties to make legal representations in
demand letters and other pre-suit communications sent in
contemplation of possible litigation." Id. For reasons that
will be explained further below, the reasoning from Sosa bars
the demand letters and pre-judgment settlement negotiations in
this case from forming the basis of a RICO claim.

## *The Autumn Avenue Property Claims Are Dismissed for Lack of Standing*

Plaintiff alleges that he was illegally charged for
attorneys' fees before judgment on the foreclosure action for
his two properties; however, Defendants obtained a final
judgment of foreclosure on the Autumn Avenue property. The final
judgment awarded fees and costs to their attorneys in the

16

foreclosure action, which invalidates the basis for Plaintiff's claim on that property.  (See Pistilli Decl. Ex. 9 at 5-6.)

Plaintiff lacks Article III standing to assert claims relating to the Autumn Avenue property because Plaintiff did not suffer a cognizable harm with respect to that property.  Under Article III of the Constitution, a party has standing to sue in federal court only if he has suffered "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  Davis v. Fed. Election Comm'n, 554 U.S. 724, 733 (2008).  Here, Plaintiff alleges that Defendants cannot collect attorneys' fees and costs "until (a) a foreclosure judgment has been granted to the defendants and (b) costs, disbursements, and expenses [a]re awarded by the Court."  (Compl. at ¶ 65.)  Because the state court has already granted a foreclosure judgment and awarded fees and costs, Plaintiff has no "injury" that is "likely to be redressed by a favorable ruling" in this Court.  Davis, 554 U.S. at 733.

The fact that certain Defendants sought to collect attorneys' fees and costs before the entry of a final judgment does not alter this conclusion.  Plaintiff does not allege that he actually paid any attorneys' fees or costs relating to the

17

Autumn Avenue property before entry of a final judgment.
Accordingly, any purported injury based on Defendants' alleged
misrepresentations would be far too "conjectural and
hypothetical" to give rise to Article III standing. Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The absence of any alleged injury to Plaintiff
regarding the Autumn Avenue property is fatal to the merits of
his claims. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291
(2d Cir. 2006) (holding that plaintiff cannot recover for common
law fraud absent allegations of "injury" resulting from the
alleged fraud); Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d
Cir. 2000) (holding that plaintiff cannot recover under GBL §
349 absent allegations that "the plaintiff has been injured");
World Wrestling Entm't, Inc. v. Jakks Pacific, Inc., 530 F.
Supp. 2d 486, 520-21 (S.D.N.Y. 2007) (holding that failure to
allege injury to plaintiff's "business or property" is fatal to
a RICO claim); Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.
2000) (holding that plaintiff cannot state an unjust enrichment
claim unless "'one party has received money or a benefit at the
expense of another'" (citation omitted)).

Finally, Plaintiff's Autumn Avenue claims are barred
by res judicata because the fees could have been challenged in

18

the underlying foreclosure action.  Under res judicata, "a final

judgment on the merits of an action precludes the parties or

their privies from relitigating issues that were or could have

been raised in that action."  Monahan v. New York City Dep't of

Corrections, 214 F.3d 275, 284 (2d Cir. 2000) (internal

quotation marks omitted). A plaintiff is therefore barred from

asserting "a later claim arising out of the same factual

grouping as an earlier litigated claim even if the later claim

is based on different legal theories or seeks dissimilar or

additional relief."  Burgos v. Hopkins, 14 F.3d 787, 790 (2d

Cir. 1994).


        In this case, the Plaintiff seeks in this action to

challenge the amount of attorneys' fees and costs sought in

connection with the Autumn Avenue property, a contention which

could and should have been raised in the state court foreclosure

proceedings.  By entering a judgment of foreclosure and awarding

fees and costs to Defendants' attorneys, the New York state

court fully and finally adjudicated the issue of attorneys' fees

and costs for the Autumn Avenue property.  Res judicata

therefore bars Plaintiff from collaterally attacking the state

court's judgment.  See Swiatkowski v. Citibank, 745 F. Supp. 2d

150, 167, 171-72 (E.D.N.Y. 2010) (res judicata barred RICO

claims that "could have been raised as claims or defenses in the

19

[foreclosure proceeding]"); Hinds v. Option One Mortg. Corp.,
No. 11 CV 06149(NGG)(RER), 2012 WL 6827477, at *5 (E.D.N.Y. Dec.
6, 2012) (res judicata barred claims that defendants inflated
"fees, costs, and expenses" during foreclosure proceedings).

**The Liberty Avenue Property Claims for Attorneys' Fees Fail
Because the Parties Voluntarily Agreed to Settle Those Fees in
the Foreclosure Action**

Plaintiff claims that the New York CPLR prohibits
collection of the attorneys' fees before a final judgment is
entered in a foreclosure action, but this misapplies the law to
these facts. The CPLR "govern the procedure in civil judicial
proceedings"; but do not apply to voluntary settlements between
private parties. N.Y. CPLR § 101. Thus, while the CPLR
authorizes courts to award fees and costs to prevailing parties,
id. § 8101, the rules do not prohibit settling parties from
recouping their costs before entry of a final foreclosure
judgment. See Boyd, 2012 WL 4718823, at *11 (E.D.N.Y. Aug. 27,
2012) (Reyes, M.J.) ("The CPLR, with its broad language, permits
Defendants to collect the costs and disbursements that they
sought.").[1]

---

[1] The Plaintiff has criticized Defendants' citation to the report
issued by Magistrate Judge Reyes in Boyd because the district court did not
adopt the entire report. See Opp. at 27 n.10. The district court, however,
did not reject or disagree but rejected plaintiffs' federal claims on
alternative grounds and declined to exercise supplemental jurisdiction over
their state-law claims. See Boyd, 2012 WL 4718723.

**The RICO Claim is Dismissed**

To state a RICO claim, a plaintiff must allege (i) the commission of two or more RICO predicate acts as part of a "pattern of racketeering activity," and (ii) the existence of a RICO "enterprise." 18 U.S.C. § 1962(c). The Complaint acknowledges these required elements (Compl. at ¶¶ 107-34), but fails to plead them.

The Complaint does not adequately allege that Defendants committed two or more RICO "predicate acts." See 18 U.S.C. § 1961(5); see also DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001). Plaintiff asserts as predicate acts criminal mail and wire fraud. (See Compl. at ¶¶ 119-34.) To plead mail or wire fraud, a plaintiff must allege "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996). The Complaint does not allege sufficient facts to establish these elements.

21

Plaintiff alleges that Defendants committed mail and wire fraud by misrepresenting their legal entitlement to attorneys' fees and costs under New York law. (See Compl. at ¶¶ 66, 69, 72, 76.)  These allegations do not state a mail or wire fraud claim for two independent reasons.

First, Defendants' alleged misrepresentations of law do not constitute actionable mail or wire fraud. It is "well settled" that "fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law." 37 AM. JUR. 2D of Fraud & Deceit § 101 (2014). This rule "extends to representations as to what the law requires to be done and representations to what the law will not permit to be done." Id. Such representations "are normally regarded as expressions of opinion which are generally not actionable in fraud even if they are false." Miller v. Yokohama Tire Corp., 358 F.3d 616, 621 (9th Cir. 2004); see Sosa, 437 F.3d at 940 ("misrepresentations of the law are not actionable as fraud, including under the mail and wire fraud statutes, because statements of the law are considered merely opinions and may not be relied upon absent special circumstances not present here").

Plaintiff has alleged that Defendants committed mail and wire fraud by "falsely" representing to Plaintiff that

22

attorneys' fees and costs incurred in the foreclosure action were "due and owing" prior to entry of a final judgment. (Compl. at ¶¶ 63-64, 66, 69, 72, 76.)  Even if this were the case, Plaintiff's allegations do not amount to a valid claim for mail or wire fraud and the RICO claims are therefore dismissed.

In Sosa, the plaintiffs asserted RICO claims against the defendant for accusing the plaintiffs of violating federal law in pre-suit demand letters.  Sosa, 437 F.3d at 926-27.  The court concluded that the mail and wire fraud statutes did not cover "erroneous representations of law made in a presuit demand letter" because "legal representations made by potential litigation adversaries are exceedingly unlikely to be believed without investigation."  Id. at 941.  The court thus held that the plaintiffs' allegations "cannot support the mail and wire fraud predicates, even if [the defendant] intentionally misstated the law."  Id.

Applying the reasoning of Sosa to the analogous facts here, Plaintiff cannot maintain a RICO action with mail and wire fraud predicates for "litigation activities," which "cannot properly form the basis for RICO predicate acts."  Curtis & Assoc., P.C. v. Law Offices of David M. Bushman, Esq., 758 F. Supp. 2d 153, 171 (E.D.N.Y. 2010), aff'd 443 F. App'x 582 (2d

23

Cir. 2011). In this case, Defendants' allegedly fraudulent statements took place in the context of pre-litigation demands or settlement communications with Plaintiff. (See Compl. at ¶¶ 63-70, 85.) Plaintiff has alleged that an offer of settlement from Xspand dated March 28, 2012 was "false" because it stated that Plaintiff owed legal fees and costs. (Id. at ¶ 66.) Similarly, Plaintiff has asserted that a demand letter from MTAG dated February 18, 2014 was "false" because it represented that Plaintiff might need to pay "legal fees and costs" if the account were referred to an attorney for foreclosure. (Id. at ¶¶ 91-92.) These types of litigation-related communications "cannot support claims of mail fraud and wire fraud as predicate acts under RICO." FindTheBest.com, Inc. v. Lumen View Tech. LLC, 20 F. Supp. 3d 451, 454, 460 (S.D.N.Y. 2014).

Permitting RICO claims based on legal positions taken by litigation adversaries "would result in the inundation of federal courts with civil RICO actions that could potentially subsume all other state and federal litigation in an endless cycle where any victorious litigant immediately sues opponents for RICO violations." Curtis, 758 F. Supp. 2d at 173. Likewise here, Plaintiff has not stated a RICO claim because Defendants' litigation-related communications with Plaintiff cannot amount to RICO predicate acts. See Synder v. U.S. Equities Corp., No.

24

12 CV 6092(CJS), 2014 WL 317189, at *7 (W.D.N.Y. Jan. 28, 2014)
("a defendant's use of mail and wire to conduct allegedly
fraudulent 'litigation activities' is insufficient to establish
predicate acts of racketeering"); Goldberg v. Merrill Lynch,
Pierce, Fenner & Smith, Inc., No. 97 CV 8779(RPP), 1998 WL
321446, at *4-5 (S.D.N.Y. June 18, 1998) ("litigation and pre-
litigation conduct" cannot "form the basis of a claim for mail
or wire fraud"); Morin v. Trupin, 711 F. Supp. 97, 106 (S.D.N.Y.
1989) ("the threat by an attorney to bring a lawsuit is not a
predicate RICO act"); see also Heights Cmty. Congress v. Smythe,
Cramer Co., 862 F. Supp. 204, 206-07 (N.D. Ohio 1994) ("[A]
threat to sue unless an individual agrees to a settlement 'does
not constitute a criminal act and is not a predicate act for
RICO purposes.'" (citation omitted)).

        In addition, the Plaintiff has failed to allege any
facts indicating that Defendants knowingly and intentionally
committed fraud.  To state a predicate act of mail or wire
fraud, a complaint must plead specific facts supporting a
"strong inference" that the defendant acted with "fraudulent
intent."  O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d
674, 676 (2d Cir. 1991) (citation and quotations omitted).  The
alleged facts must support a plausible inference that the
defendant "contemplated some actual harm or injury to" the

                            25

plaintiff.  United States v. Starr, 816 F.2d 94, 98 (2d Cir.
1987) (emphasis in original).

　　　　　Although the Complaint asserts in conclusory fashion
that Defendants "knew" they had no right to collect attorneys'
fees and costs, it pleads no facts in support of that assertion.
The Plaintiff points to the text of Section 11-335 and the CPLR
and concludes that Defendants should have known that fees and
costs were not recoverable absent a foreclosure judgment.  (See
Compl. at ¶¶ 45-48.)  Even if Plaintiff were correct, the
allegations in the Complaint do not plausibly suggest that
Defendants knowingly or intentionally misinterpreted New York
law with the specific intent of harming Plaintiff.  Rather, the
well-pleaded allegations of the Complaint are entirely
consistent with a good faith belief that Defendants were
entitled to collect attorneys' fees and costs.  See O'Malley v.
New York City Transit Auth., 896 F.2d 704, 706 (2d Cir. 1990)
("Acts done inadvertently, mistakenly, or in good faith without
an intent to defraud do not satisfy the requirements of the
statute."); Claude v. Wells Fargo Home Mortg., No. 03:13 CV
00535(VLB), 2014 WL 4073215, at *5 (D. Conn. Aug. 14, 2014)
(allegations that defendant "'knew or had every reason to
believe that the statements . . . were untrue' . . . are
insufficient labels or conclusions"); cf. Edmonds v. Seavey, No.

26

08 CV 5646(HB), 2009 WL 2949757, at *5 (S.D.N.Y. Sept. 15, 2009)
("Mere negligence is insufficient to support a RICO claim that
is based on [mail or wire fraud].").

In virtually identical circumstances, Magistrate Judge
Reyes concluded in Boyd that the plaintiffs had failed to show
that the defendants "engaged in practices or acts that were
deceptive or materially misleading." Boyd, 2012 WL 4718823, at
*15. Far from being fraudulent, the communications "disclose[d]
that [Defendants] were collecting legal fees and costs separate
and apart from the Tax Lien balance." Id. Accordingly, the
Servicers' demands for the payment of attorneys' fees and costs
from Plaintiff were not deceptive. See id.; see also A. Terzi
Prods., Inc. v. Theatrical Protective Union, 2 F. Supp. 2d 485,
501 (S.D.N.Y. 1998) (dismissing RICO claims where the
defendants' "demands may have been wrongful . . . but they were
not deceptive").

Plaintiff's RICO claim is also dismissed also because
the Complaint does not adequately allege a RICO enterprise.  A
RICO enterprise consists of "an ongoing organization" whose
"associates function as a continuing unit." United States v.
Turkette, 452 U.S. 576, 583 (1981).  Plaintiff must therefore
allege sufficient facts to demonstrate the "hierarchy,

27

organization, and activities" of the alleged enterprise and that "its members functioned as a unit." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174-75 (2d Cir. 2004) (citation and quotations omitted). It is not enough to allege "a series of similar but essentially separate frauds carried out by related entities." City of New York v. Chavez, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013), vacated on other grounds, 579 F. App'x 15 (2d Cir. 2014). "If each act of fraud is equally effective without the perpetration of any other act of fraud – even if perhaps effective to a far lesser or different magnitude – then there is no RICO enterprise." Id.; see also Cedar Swamp Holdings, Inc. v. Zaman, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007) ("[A] series of independent fraudulent transactions . . . is insufficient to justify a conclusion that the perpetrator and the accomplices together constituted an ongoing organization or functioned as a continuing unit.").

The Complaint lacks well-pleaded factual allegations that Defendants worked together as part of a cohesive criminal enterprise. Although Plaintiff asserts that Defendants "functioned as a continuing unit with an ascertainable structure" (Compl. at ¶¶ 108, 111), he "fail[s] to make any concrete factual assertions as to the mechanics of the interactions among defendants." Cont'l Petroleum Corp. v. Corp.

28

Funding Partners, LLC, No. 11 CV 7801(PAE), 2012 WL 1231775, at
*6 (S.D.N.Y. Apr. 12, 2012). Instead, the Complaint at most
describes a series of discontinuous and independent attempts by
Defendants to collect delinquent tax liens. Under RICO,
however, Plaintiff must allege an integrated and cohesive
criminal enterprise, not just a series of independent fraudulent
acts. City of New York, 944 F. Supp. 2d at 275; Cedar Swamp,
487 F. Supp. 2d at 451.

       Plaintiff asserts that "[v]arious agreements bind the
members" of the enterprise together (Compl. at ¶¶ 109, 112,
115), but a RICO "enterprise must be more than a routine
contractual combination for the provision of financial
services." Jubelirer v. MasterCard Int'l, Inc., 68 F. Supp. 2d
1049, 1053 (W.D. Wis. 1999). Without a discernible organization
or at least some unitary function, the mere existence of routine
business relationships among the defendants is insufficient to
establish an "enterprise" under RICO. See Bonadio v. PHH Mortg.
Corp., No. 12 CV 3421(VB), 2014 WL 522784, at *3 (S.D.N.Y. Jan.
31, 2014) (dismissing RICO claim when plaintiff's "only factual
allegations relating to the enterprise are that its members had
ongoing business relationships"); Nordberg v. Trilegiant Corp.,
445 F. Supp. 2d 1082, 1092 (N.D. Cal. 2006) (rejecting a RICO
enterprise based upon "the existence of routine contractual

relationships"). Plaintiff's enterprise allegations thus fail
as a matter of law.

Plaintiff's RICO conspiracy claim is dismissed because
it is derivative of Plaintiff's defective RICO claims. (See
Compl. at ¶ 137.) A plaintiff who fails to state a claim for an
underlying violation of RICO cannot state a claim for a RICO
conspiracy. See, e.g., First Capital Asset Mgmt., 385 F.3d at
182.

The conspiracy claim also should be dismissed because
the Complaint lacks sufficient allegations that Defendants
entered into an agreement to violate RICO. To state a RICO
conspiracy claim, "a plaintiff must plead that a defendant
agreed to participate in the affairs of the enterprise through a
pattern of racketeering activity." N.Y. Dist. Council of
Carpenters Pension Fund v. Forde, 939 F. Supp. 2d 268, 282
(S.D.N.Y. 2013). Allegations that the defendants "'should have
known' is not enough to establish conspiracy, which is a crime
of specific intent." Zito v. Leasecomm Corp., No. 02 CV
8074(GEL), 2003 WL 22251352, at *20 (S.D.N.Y. Sept. 30, 2003).
"To prove a conspiracy, a plaintiff must show that a defendant
joined the conspiracy with the intent to commit the offenses
that are its object, that is, with the affirmative intent to

make the conspiracy succeed." Id.; see also Burke v. Dowling,

944 F. Supp. 1036, 1068 (E.D.N.Y. 1995) (RICO conspiracy

requires a "conscious agreement" to the commission of predicate

acts).

Although the Complaint contains allegations of a so-

called "agreement" to "falsely and fraudulently represent that

legal fees and expenses were owed by delinquent New York City

taxpaying residents" (Compl. at ¶¶ 138-39), it fails to allege

that Defendants knowingly and intentionally entered into

agreements with each other to violate the law. Even at the

pleading stage, Plaintiff's conclusory assertions are

insufficient to state a RICO conspiracy involving Defendants.

See Connolly v. Havens, 763 F. Supp. 6, 14 (S.D.N.Y. 1991)

(dismissing RICO conspiracy claim where plaintiffs "merely made

conclusory allegations, parroting the language of the RICO

statute"); Laverpool v. N.Y.C. Transit Auth., 760 F. Supp. 1046,

1060 (E.D.N.Y. 1991) (dismissing RICO conspiracy because "[i]t

is not clear from the face of the pleading how, or even if, each

defendant participated in the alleged conspiracy to violate

RICO").

Plaintiff denies that his claims involve

"representations of law," however the Complaint rests on the

31

theory that Defendants committed fraud by misrepresenting their legal authority to seek costs and expenses under New York law. Plaintiff does not dispute that Defendants incurred litigation costs by filing foreclosure actions on Plaintiff's properties. Plaintiff nevertheless asserts that Defendants cannot – as a matter of New York law – seek to recoup those costs unless a court enters a final foreclosure judgment.  Because Plaintiff's claims involve "representations as to what the law requires to be done and representations to what the law will not permit to be done," 37 AM. JR. 2D of Fraud & Deceit, § 101 (2014), they involve alleged misrepresentations of law and cannot be the basis of a RICO action.

Plaintiff's fails to identify a single specific statement in these communications that purportedly rises to the level of criminal mail or wire fraud.  Defendant made statements to Plaintiff that monies were "due" under the terms of the settlement agreement that he voluntarily executed, and so were plainly not misleading.  (See Pistilli Decl. Exs. 3-4.)  At no point did any Defendant ever seek litigation expenses from Plaintiff without (i) itemizing those expenses and (ii) fully disclosing that they were separate from the principal balance and interest amounts owed.  (See, e.g., id. Exs. 1, 7-8.)

Plaintiff insists that his enterprise allegations are sufficient because Defendants "had ongoing relationships embodied in a series of agreements between them." (Opp. at 30.) Plaintiff is mistaken. Under settled law, a plaintiff must allege more than routine contractual relationships among defendants to establish a RICO enterprise and Plaintiff in this case has failed to meet that requirement.

**The GBL § 349 Claim is Dismissed**

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." To establish a claim under the statute, a plaintiff must allege that the defendant "has engaged in (1) consumer-oriented conduct that is (2) materially misleading." City of New York v. Smokes-Spirits.Com, Inc., 911 N.E.2d 834, 838 (N.Y. 2009). Plaintiff's GBL § 349 claim against Defendants is dismissed because his allegations do not satisfy either of these elements.

"[I]n order to state a prima facie case under section 349, a plaintiff must allege conduct of the defendant that is consumer oriented." Kinkopf v. Triborough Bridge & Tunnel Auth., 6 Misc. 3d 73, 74 (N.Y. App. Div. 2004) (citing Oswego

33

Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85
N.Y.2d 20 (1995)).

In Kinkopf, the trial court held that the defendant
violated GBL § 349 in connection with its efforts to collect
toll charges from the plaintiff.  Kinkopf, 6 Misc. at 74.  The
appellate court reversed, explaining that tolls are "in essence
a use tax," and that the collection of tolls is therefore "not a
consumer oriented transaction."  Id.

Plaintiff's allegations fail to support a GBL § 349
claim for the additional reason that they arise in the context
of foreclosure litigation.  When confronted with a virtually
identical claim in Boyd, Magistrate Judge Reyes concluded that
the challenged practices "do not concern consumer transactions
as contemplated by [GBL § 349]."  Boyd, 2012 WL 4718823, at *14.
As Judge Reyes explained, "Plaintiffs challenge allegedly
improper attorney's fees and costs that they paid in the context
of settlement, removing the issue from the market place into the
courtroom.  Plaintiffs have therefore failed to establish that
they were 'consumers' within the meaning of GBL § 349."  Id.
For the same reasoning as in Boyd, Plaintiff's GBL § 349 claim
is dismissed.

Plaintiff must also plead that Defendants engaged in a "deceptive act or practice" in order to state a claim under GBL § 349.  The New York courts have adopted "an objective definition of deceptive acts and practices . . . limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances."  Oswego Laborers' Local 214 Pension Fund, 647 N.E.2d at 745.  Here, Plaintiff has failed to plead any objectively misleading conduct by Defendants.

The very communications on which Plaintiff relies to support his claim fully disclosed the relevant facts.  For example, the settlement agreement Plaintiff signed for the Liberty Avenue property clearly indicated that the amount Plaintiff was agreeing to pay included "attorney's fees" and "costs."  (Pistilli Decl. Ex. 2, Recital 2.)  The delinquency notices for the Autumn Avenue property indicated that the outstanding balance included "estimated legal fees and costs." (Pistilli Decl. Exs. 7, 8.)  The Payoff Quotes for both properties separately itemized the fees and costs being sought from Plaintiff.  (Pistilli Decl. Exs. 1, 7-8.)

Even assuming that Defendants were not entitled to collect attorneys' fees and costs from Plaintiff, Defendants "did not mislead [Plaintiff] in any material way."  Varela v.

Investors Ins. Holding Corp., 81 N.Y.2d 958, 961 (1993) (law firm's refusal to file a satisfaction of judgment until judgment debtor paid it a fee, while potentially improper, was not deceptive); see also Boyd, 2012 WL 4718823, at *15 (finding no deception because defendants "disclose[d] that they were collecting legal fees and costs separate and apart from the Tax Lien balance" and "clearly identified the costs as 'estimated'").

Plaintiff argues that consumer-oriented conduct is not required under GBL § 349 where the plaintiff alleges "harm to the public at large." Securitron Mugnulock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995). However, the New York Court of Appeals has held that GBL § 349 "is directed at wrongs against the consuming public." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y. 2d 20, 24, 647 N.E. 2d 741, 744 (1995). In Kinkopf, the allegedly improper collection of toll charges was not actionable under GBL § 349 because the collection of tolls "is not a consumer oriented transaction," notwithstanding the fact that toll collection plainly affects the public at large. Kinkopf, 6 Misc. 3d at 74. Because the collection of mandatory water, sewer and tax charges likewise is not a consumer oriented transaction, see Boyd, 765 F.3d 123, 126 (2d Cir. 2014), Plaintiff's GBL § 349 claim is dismissed.

***The Common Law Fraud Claim is Dismissed***

"The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009). Because these elements are similar to those required for mail and wire fraud, Plaintiff's common law fraud claim fails for substantially the same reasons discussed above. See, e.g., Gov't Emps. Ins. Co. v. Scheer, No. 13 CV 04039(SLT)(SMG), 2014 WL 4966150, at *8 (E.D.N.Y. Aug. 18, 2014) ("The elements of mail fraud are similar to those of common law fraud except that common law fraud also requires a showing of plaintiffs' reasonable reliance on defendants' fraudulent misrepresentations.").

Plaintiff's common law fraud claim also fails because the Complaint does not allege reasonable reliance on Defendants' purported misrepresentations. As to the Autumn Avenue property, Plaintiff has not claimed to have relied on Defendants' alleged misrepresentations or to have suffered any injury because he never made any payments for that property. See GMA Accessories, Inc. v. Idea Nuova, Inc., 157 F. Supp. 2d 234, 243 (S.D.N.Y.

37

2000) (dismissing fraud claim where plaintiff "failed to plead
how it was injured as a result of [the] allegedly false
statement").  As to the Liberty Avenue property, Plaintiff
pleads no facts suggesting that, but for Defendants' alleged
misrepresentations, he would have refused to pay the amounts
demanded by Defendants and instead gone forward with the
foreclosure litigation.  See MAFG Art Fund, LLC v. Gagosian, 998
N.Y.S.2d 342, 343 (N.Y. App. Div. 2014) ("complaint fails to
state a cause of action for fraud [where] plaintiffs did not
allege justifiable reliance").

**The Claim for Unjust Enrichment is Dismissed**

"The basic elements of an unjust enrichment claim in
New York require proof that (1) defendant was enriched, (2) at
plaintiff's expense, and (3) equity and good conscience militate
against permitting defendant to retain what plaintiff is seeking
to recover."  Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,
373 F.3d 296, 306 (2d Cir. 2004).  Plaintiff cannot satisfy
these elements with respect to either of his properties.

Autumn Avenue Property

38

Plaintiff cannot state an unjust enrichment claim for the Autumn Avenue property because he does not allege that he ever made a payment relating to that property.  Accordingly, Defendants manifestly were not enriched at Plaintiff's expense. See Kaye, 202 F.3d at 616 (holding that plaintiff cannot state an unjust enrichment claim unless "one party has received money or a benefit at the expense of another" (internal citations omitted)).

### Liberty Avenue Property

Plaintiff's unjust enrichment claim regarding the Liberty Avenue property also fails.

First, "claims for unjust enrichment . . . are non-contractual, equitable remedies that are inapplicable if there is an enforceable contract governing the subject matter." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 60 (2d Cir. 1997) (citation omitted).  Here, Plaintiff acknowledged in his settlement agreement with Xspand that the amount due on the Liberty Avenue tax lien (inclusive of attorneys' fees and costs) was nearly $55,000, and he agreed to pay this amount.  (See Compl. at ¶¶ 67-68, Pistilli Decl. Ex. 2, Recital No. 2, ¶ 5.) This written agreement bars any attempt by Plaintiff to assert a

39

claim for unjust enrichment regarding payments made pursuant to
that contract. Granite Partners, L.P. v. Bear, Stearns & Co.,
17 F. Supp. 2d 275, 312 (S.D.N.Y. 1998) ("[P]ayments made
pursuant to the express terms of a contract cannot be recovered
via unjust enrichment.").


          Second, the unjust enrichment claim is barred by the
voluntary payment doctrine. New York's voluntary payment
doctrine bars common-law claims where a plaintiff paid allegedly
improper charges "without protest or even inquiry, and w[as] not
laboring under any material mistake of fact when [he] did so."
Westfall v. Chase Lincoln First Bank, N.A., 258 A.D.2d 299, 300
(1999) (dismissing unjust enrichment claim under the voluntary
payment doctrine). Here, Plaintiff voluntarily paid the amounts
sought by Defendants in connection with the Liberty Avenue
property, with full knowledge that these amounts included
attorneys' fees and costs. Accordingly, the voluntary payment
doctrine bars his claim. See id.; see also Dillon v. U-A
Columbia Cablevision of Westchester, Inc., 100 N.Y.2d 525, 526
(2003).


          Plaintiff's unjust enrichment claim regarding the
Liberty Avenue property fails as a matter of law because he
voluntarily paid the amounts demanded for the Liberty Avenue

                                40

property pursuant to a written settlement agreement, with full knowledge that the amount included litigation costs and expenses. Although Plaintiff admits that a written agreement ordinarily bars an unjust enrichment claim, he asserts that Defendants engaged in fraudulent inducement with respect to that agreement. Plaintiff pleads no facts indicating that, but for Defendants' alleged misrepresentations, he would have refused to pay the amounts demanded by Defendants and instead would have gone forward with foreclosure litigation.

Plaintiff's claim also is dismissed because there are no allegations that the Trusts were enriched unjustly. "A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties." Rettig v. Holler, 1 Misc. 3d 904(A), at 2, 781 N.Y.S. 2d 627 (Sup. Ct. N.Y. County 2003). Here, there is no dispute that Plaintiff failed to pay water and sewer taxes on the Liberty Avenue property, or that the Trusts incurred substantial litigation expenses in attempting to collect that debt. Because the Trusts did not "receive[] a benefit, the retention of which would be unjust," Plaintiff's claim is dismissed. Id.

**The Mooring Claim to Pierce the Corporate Veil is Dismissed**

41

Plaintiff's attempt to pierce the corporate veil between MTAG and Mooring is dismissed because the Complaint does not allege that Plaintiff had any interactions with Mooring; nor that any Mooring employee participated in the injurious conduct.

Courts are "extremely reluctant" to disregard the separate existence of a corporation and its shareholders. United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000). A plaintiff seeking to hold one corporate entity responsible for the conduct of a corporate affiliate must therefore plead "specific facts" sufficient to overcome the "'presumption of separateness afforded to related corporations.'" Kingdom 5-KR-41, Ltd. v. Star Cruises PLC, No. 01 CIV. 2946, 2002 WL 432390, at *12 (S.D.N.Y. Mar. 20, 2002) (quoting De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69-70 (2d Cir. 1996)). Two essential elements are necessary to overcome this presumption. First, the plaintiff must allege facts sufficient to support the conclusion that "the owners exercised complete domination of the corporation in respect to the transaction attacked." EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (internal quotation marks omitted). Second, the plaintiff must allege "that such domination was used to

42

commit a fraud or wrong against [him] which resulted in [his] injury." Id. at 512 (internal quotation marks omitted).

Here, Plaintiff has not adequately alleged either of these elements. As to domination and control, the Complaint consists of nothing more than conclusory assertions that "Mooring is the alter ego of MTAG" and that the two companies "share common officers, owners, Board of Directors, offices, employees and assets." (Compl. at ¶¶ 158, 160.) This bare-bone, "unadorned invocation of dominion and control is simply not enough." In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003).

As to misuse of the corporate form, the Complaint alleges no facts suggesting that Mooring committed a fraud or wrong through a misuse of MTAG's corporate form that resulted in his injury. Indeed, Plaintiff does not allege any "misuse" of the corporate form at all – or a misuse that caused him injury. In the absence of any concrete allegation that Plaintiff was harmed by a misuse of the corporate form, the veil-piercing allegations are dismissed. See, e.g., EED Holdings, 228 F.R.D. at 512-13 (dismissing veil-piercing claim where plaintiff's allegation of harm consisted only of a conclusory assertion that the parent's domination "has caused a wrong to be committed");

LaCourte v. JP Morgan Chase & Co., No. 12 CV 9453(JSR), 2013 WL
4830935, at *5-6 (S.D.N.Y. Sept. 4, 2013) (dismissing veil-
piercing claim where plaintiff "fails to plausibly allege
complete domination" or "that an abuse of the corporate form
caused him any fraud or injustice").

**Conclusion**

     For the reasons set forth above, Defendants' motion to
dismiss is granted.

It is so ordered.

New York, NY
July 〕ᒋ , 2016

ROBERT W. SWEET
U.S.D.J.